STRUCTURAL LAMINATES, INC., a Corporation, Plaintiff,

v.

DOUGLAS FIR PLYWOOD ASSOCIATION, a Corporation, Defendant.

No. 63–540.

United States District Court
D. Oregon.

Dec. 1, 1966.

Lee Johnson, John C. McLean, Robert L. Weiss, and Alfred Hampson, Portland, Or., for plaintiff.

Barzee, Leedy & Tassock, Portland, Or., Schweppe, Reiter, Doolittle & Krug, Seattle, Wash., for defendant.

## OPINION

RUSSELL E. SMITH, District Judge.

Plaintiff, Structural Laminates, Inc., brings this action to recover treble damages under Section 4 of the Clayton Act.[1] It claims that defendant, Douglas Fir Plywood Association (DFPA), a trade association, conspired with its member companies to damage and destroy plaintiff's business in violation of Section 1 of the Sherman Act.[2]

Plaintiff completed the construction of a plywood mill late in 1957. It claimed that the mill was designed to produce, from purchased veneer, ½ inch 3-ply sheathing plywood which would be used mainly for construction purposes. This plywood was made of three pieces of relatively low grade veneer, each ⅙″ thick. The most commonly used ½″ sheathing is made of 5 pieces of veneer, each 1/10″ thick. Because plaintiff intended to use the thicker veneer, it designed its mill with a kiln-type dryer instead of the roller dryer almost universally used in the plywood industry.

The gravamen of plaintiff's case, which is based on two somewhat different theories, is that defendant conspired with its members to limit plaintiff's access to the plywood market causing loss of profits to plaintiff and the eventual destruction of its business in November, 1960. The defendant denied the conspiracy, set up the statute of limitations, and claimed that plaintiff's losses were due to the nature of plaintiff's product and a falling market.

The defendant corporation is a trade association organized to promote the sale of plywood. It derives its principal support from members who pay dues based upon the volume of plywood produced by each. In the years important here, defendant's 109 to 128 members manufactured from 82 to 89 per cent of all of the softwood plywood produced in the

---

1. 15 U.S.C. § 15.

2. 15 U.S.C. § 1.

United States. Defendant spent $3,800,000 in 1958 and $5,200,000 in 1960. About 60 per cent of the money was spent in the promotion of softwood plywood with some special attention to that manufactured by defendant's members, and about 21 per cent in its technical activities, which included a quality control program and research. Defendant had 10 regional offices in the United States and a substantial field staff to man these offices. This staff called upon members, prospective members, and those who used or directed the use of building materials. In its quality control program defendant inspected member mills and sampled member products and it permitted members who met its quality control standards and the commercial standards as well to use defendant's grade-trade stamp and a certificate. These stamps and certificates told the purchaser of plywood that the manufacturing mill had met the defendant's quality control standards and that the product met the commercial standards as well. Defendant has on occasion also permitted the use of its trademark "DFPA TESTED QUALITY" on certain specialized products which have not conformed to the constructions specified in the Commercial Standards. However, no reference has been made on such occasions to any Commercial Standard or conformance thereto. The defendant has a real and legitimate interest in the reputation of plywood.

Commercial Standards are published by the United States Department of Commerce. The Department does not propose standards, and standards when published do not have the force of law. They do reflect the consensus of the industry and when published, become a basis of common understanding in the business involved. Manufacturers of plywood which conforms to the Standard may and do indicate on the product the conformity. Plywood not bearing the marks indicating conformity to the standard is more difficult to sell [3] and brings a lower price.[4]

The Department of Commerce will not publish a Standard or revise a published standard until satisfied that it is approved by the industry and other interested groups. Generally the Department requires approval by seventy-five per cent of the producers of the product. The Department sets up the procedure for circularizing the trade and determines which related groups such as consumers and governmental agencies should be consulted.

The defendant has played a dominant role in the adoption of Commercial Standards for plywood. Its committees have determined the need for standards, written drafts of them, proposed them to the Department, and solicited approval by members of the industry. Its technical staff is respected by the Department of Commerce and the industry and its field staff has been able to sell proposed standards and amendments to the industry and other interested persons.

In 1933, defendant proposed the first commercial standard for Douglas Fir Plywood, CS 45–33.[5] At defendant's instance, CS 45 has been revised ten times, most recently in 1963. Defendant has also sponsored several amendments to the various revised standards. In 1945, defendant proposed the first Commercial Standard for Western Softwood Plywood,

3. Most state and local building codes require that plywood used for building construction comply with these Commercial Standards. The Uniform Code of the International Conference of Building Officials, the Uniform Code of the Building Officials Conference of America, and the Southern Building Code Conference all specify that plywood used in construction must conform to the Commercial Standards. Likewise, the Federal Housing Administration in its minimum Property Standards requires that all plywood used in FHA insured housing must conform with these Commercial Standards. (Agreed Fact 34)

4. The evidence here indicates that certified C–D interior sheathing brings about $6.00 per thousand square feet more than the non-certified.

5. The –33 indicates the year of last revision.

CS 122–45. At defendant's instance, CS 122 has been revised four times, most recently in 1963. CS 45 and CS 122 are identical in relevant content and so alike in their relevant history that further reference is made only to CS 45.

Plaintiff proceeds on two theories. The first is that under CS 45–55, 3-ply ½″ was a permitted construction if it met the performance tests set out in the Standard, and that the defendant in violation of the anti-trust laws, advised consumers and others to the contrary. The published CS 45–55 contains in a footnote to a table the following:

"Minimum number of plies required for standard construction:
3 plies, for ¼–, ⁵⁄₁₆–, and ⅜ in.
5 plies for ½–, ⅝–, and ¾ in.
7 plies for ⅞– to 1³⁄₁₆ in."

Historically there was reason for excluding 3-ply ½″ from the standard. Other footnotes to tables, arranged exactly as the quoted one, definitely specify what does and what does not conform. The trade generally interpreted the standards to exclude 3-ply ½″. For these reasons if the standard was ambiguous in the light of its mechanical arrangement or the other language in it, which the court thinks it is not, still the court would interpret it to exclude the 3-ply ½″ construction.

Prior to November, 1958 the defendant did advise a prospective purchaser of plaintiff's 3-ply ½″ plywood that it did not meet the Commercial Standard and thereby killed a sale of about 830,000 square feet. Likewise in the spring of 1958 defendant advised the Federal Housing Administration that 3-ply ½″ sheathing did not meet the commercial standards because of drying and glueing difficulties. This advice was solicited by the Federal Housing Admin-

istration as a result of plaintiff's efforts to get the Federal Housing Administration to permit the use of 3-ply ½″ in Federal Housing Administration financed construction. These were the only acts of the defendant, assuming arguendo, that the Federal Housing Administration incident was directed at plaintiff, which were specifically directed at plaintiff's sales. Even if the statute of limitations had not run,[6] the defendant properly interpreted the commercial standards and is not liable unless on the other grounds asserted by plaintiff the defendant violated the anti-trust laws.

Plaintiff's second theory is that the defendant used the standards in violation of the anti-trust laws to prevent it from selling its 3-ply ½″ and to drive it out of business.

The salient facts are these: The relatively thick veneers (⅙″, ³⁄₁₆″, and ¼″) are rough and more difficult to glue than the relatively thin veneers (¹⁄₁₀″ and ⅛″). By 1948 when the Commercial Standard definitely excluded the 3-ply ½″ construction, it had acquired a bad reputation in the industry because of bonding difficulties. This bad reputation lasted until 1963.

In the meantime, however, improvements were being made in the plywood manufacturing technology and by 1958, and perhaps earlier,[7] ⅙″ veneer could be satisfactorily bonded. Plaintiff was able to, and did, produce ½″ 3-ply panels which passed the CS 45–55 performance tests. Defendant in its laboratories tested one batch of panels in the summer of 1959. All panels passed the delamination tests. Over a substantial time the tests conducted in the laboratories of Timber Engineering Company, a reputable testing agency, indicated satisfactory bonding of plaintiff's plywood. There

---

6. 15 U.S.C. § 15b provides a four-year limitation. Both of these acts were complete in 1958. The complaint was filed November 12, 1963.

7. In the opinion of Ronald A. Whyte who was in charge of the 3-ply ½″ testing project for Weyerhauser, the industry

was capable of producing satisfactory 3-ply ½″ plywood as early as 1951. It is interesting to note however that as late as 1961 Weyerhauser, an important plywood producer, was apparently unwilling to market 3-ply ½″ until the completion of a substantial testing program.

were no substantial changes in technology between 1958 and 1963, and in 1963, on the recommendation of defendant, 3-ply ½″ became a permitted construction under CS 45–63. This was after 353 separate tests conducted over a period of 14 months by defendant's technical staff in 1961 and 1962. It was during this same period that Weyerhauser was making its similar tests. Prior to 1958, thick veneers were being used in construction approved by the Commercial Standard. There was an approved 5-ply ¾″ panel using ⁵⁄₁₆″ veneers and an approved 1⅛″ panel marketed under defendant's proprietory name, "2–4–1", using ⅙″ and ³⁄₁₆″ veneers.

Some of the defendant's members, as a part of their operations, necessarily produced large quantities of ¹⁄₁₀″ veneer of relatively low quality. This veneer they could use in a 5-ply ½″ sheathing and they had a real economic motive in opposing the wide-spread use of 3-ply ½″ sheathing which, as indicated, used the ⅙″ veneers.

Plaintiff, before the period of damage claimed here and continuously afterwards, complained to the defendant, to the Department of Justice, to the Department of Commerce, and to all others who would listen, that its 3-ply ½″ product was good and that the standard should be clarified to specifically include it.

If defendant is to be found liable on plaintiff's second theory, it must be by reason of its action or non-action with respect to CS 45. The non-action [8] consisted in failing at plaintiff's request to cause CS 45–55 to be amended to include 3-ply ½″ as a permitted construction. The action consisted in procuring amendment number two to CS 45–55.

From the beginning defendant was a dominant force in the creation, amendment and revision of the Commercial Standards, and it is guilty of a violation of the Sherman Act if what was done with respect to CS 45 was unreasonable and done with the intent to restrain trade.

A Commercial Standard must reflect a state of mind in the affected industry. The Department of Commerce will not publish one which is not accepted as satisfactory by the producers and users. There were facts indicating that thicker veneers could be satisfactorily bonded. In light of what was known in 1963, it was reasonable in 1958 to include 3-ply ½″ as a permitted construction. Some of defendant's members did have a motive for excluding 3-ply ½″ from the market. Even so the evidence does not show that as of 1958, 1959 and 1960 the exclusion of 3-ply ½″ was either unreasonable or done with an evil intent.

The parties agreed that

"Prior to 1963, most softwood plywood manufacturers were reluctant to adopt 3 ply ½ inch C–D sheathing plywood as a Commercial Standard construction principally because of technical difficulties in drying thicker veneers and in perfecting a satisfactory adhesive bond between the thicker plies." (Agreed Fact 66)

When CS 45–48 was adopted and 3-ply ½″ definitely excluded the reasons for excluding it were entirely legitimate.

In 1958 and 1959 plaintiff was the only producer of 3-ply ½″. The industry had had little experience with it using the modern glues. Plaintiff's experience did not necessarily reveal anything with respect to other plants which used dryers

---

8. Defendant's response to plaintiff's request for a clarification of CS 45 was to propose language which removed any doubt as to the exclusion of 3-ply ½″ from the standard. This language was incorporated in CS 45–60, effective Nov. 14, 1960, 14 days before the end of the period for which plaintiff claims damages. Since the language included in the revision did not change anything, it was defendant's failure to seek a change, rather than the change accomplished, which resulted in any damage that plaintiff may have suffered. Even prior to CS 45–60 no testing agency would certify the 3-ply ½″ as conforming to the Commercial Standard.

not as effective with the thicker veneers. 3-ply ½" was known to be 50% stronger and 32% stiffer in one direction than 5-ply ½", but the 5-ply ½" was 90% stronger and 400% stiffer in the other.[9] This meant that greater care had to be used in applying the 3-ply ½" in the proper direction with respect to the supporting members.

■ In light of the admitted history the court is unwilling to conclude on the basis of one mill's performance and the use of thick veneers in other constructions, that the defendant was obliged to conclude that other mills—the industry generally—could produce a uniformly satisfactory product in the 3-ply ½" construction. Likewise the court is unwilling to infer from the fact that some of the defendant's members had economic motives for opposing the use of 3-ply ½" that those motives were the defendant's motives and therefore evil.

Absent a bad purpose what was defendant's anti-trust liability? It was responsible for the commercial standards which did affect adversely the marketing of plaintiff's product. Plaintiff's 3-ply ½" was suitable for inclusion in the commercial standards, but 3-ply ½" plywood did bear a poor reputation in the industry in 1958. Had defendant been vigilant, it might have concluded in 1958, or sooner, what it did conclude in 1962—that the bad reputation was unjustified.

■ If intent and purpose are factors in the anti-trust law, and the court believes they are[10] except where per se violations are involved,[11] then the mere failure of one who is responsible for the adoption of a commercial standard to appreciate changes which make that standard obsolete and to take immediate and effective action to alter it, does not amount to a conspiracy to restrain trade. Any system of standards pre-supposes that there are standard and non-standard items. Those who produce products which are not standard are to some extent penalized and trade is to some extent restrained. This much however is congressionally sanctioned[12] and the court is of the opinion that in the absence of a bad purpose, mistakes made in the formulation or maintenance of standards do not subject the one making the mistake to anti-trust liability.

If the defendant was guilty of a violation of the Sherman Act in failing to secure a change in CS 45–55 or in procuring the adoption of CS 45–60, it does not appear from the record here that such was the proximate cause of any damage to the plaintiff. It was not until November 14, 1960 that CS 45–60 became effective. The plaintiff has not met its burden of proving and it cannot be assumed that had defendant acted in accordance with plaintiff's requests a change in CS 45–55 would have been accomplished sooner than November, 1960. It is likely that it would have taken longer. CS 45–60 did reflect the opinion of the industry. The change requested by plaintiff would have required a re-education of the industry which might not have been possible in the absence of the defendant's testing done in 1961 and 1962 and the Weyerhauser testing, the results of which were published in a trade journal in February, 1962.

■ Prior to April, 1958, the defendant adopted a resolution to present amendment number two to CS 45–55 to

9. These were the results which plaintiff obtained from tests made by the Oregon Forest Products Research Laboratory. Other tests show the same directional results with different values.

10. Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. See also Roofire Alarm Company v. Royal Indemnity Company, E.D.Tenn.

1962, 202 F.Supp. 166, affirmed 6 Cir., 313 F.2d 635, certiorari denied 373 U.S. 949, 83 S.Ct. 1678, 10 L.Ed.2d 704, a case involving standards.

11. United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333 (1913) (price fixing).

12. 15 U.S.C.A. § 272, Reorganization Plan No. 3, § 601. 11 F.R. 7877, 60 Stat. 1101, 15 C.F.R. Subtitle A, Part 10.

the Department of Commerce.[13] This amendment provided that products could not be represented as conforming to the Commercial Standard unless so certified by an independent testing agency. Amendment two was adopted and made effective May 1, 1959. Prior to that date plaintiff did certify that its 3-ply ½″ plywood conformed to the Commercial Standard. Following May 1, 1959, plaintiff could not make this certification, and although plaintiff, after May, 1959, employed the services of Timber Engineering Company, that agency would not certify that 3-ply ½″ did conform to the Standard. Defendant at all times refused to certify that the 3-ply ½″ met the Standard. For these reasons, after May 1, 1959, and as a result of CS 45–55 as amended, plaintiff was handicapped in the market because it could no longer avoid the effect of the Standard by self-certification.

When defendant started to procure Amendment No. 2, manufacturers were certifying that products conformed to the Commercial Standards, which did not in fact conform, and as indicated the plaintiff was one of these. The certifications of inferior or defective plywood could result in a fraud on the public and would tend to undermine confidence in the Standards and the plywood industry. If CS 45–55 was believed by defendant to be reasonable in 1959, then action taken to make it effective would not be unreasonable. Consequently the court cannot find that Amendment No. 2 was unreasonable or that its adoption was procured by defendant with an intention to unlawfully restrain trade.

Having so found it is unnecessary to pass on the problem of the statute of limitations or to discuss the many damages problems presented by the proof.

All motions to strike on which ruling was reserved are denied. All objections to evidence on which ruling was reserved are overruled.

This opinion, the supplemental findings and the agreed facts in the pre-trial order constitute the court's findings of fact and conclusions of law.

Counsel for defendant shall prepare and submit a judgment not inconsistent with this opinion.

### SUPPLEMENTAL FINDINGS

■ Plaintiff argues that the defendant refused to provide quality control services, inspection and certification except upon unreasonable conditions. At the time defendant procured the adoption of Amendment No. 2 to CS 44–55 it was doing substantially all of the softwood testing done in the United States. It represented to the Department of Justice and to the Department of Commerce that it would test the products of non-members at reasonable rates. Plaintiff inquired about the testing service and was advised to become a member of the defendant. Later, however, defendant did offer to provide the services for $775.00 per month or 35¢ per thousand feet, whichever was greater. It refused to permit plaintiff to use its grade stamps.

Plaintiff urges that the quoted price was unreasonable using as the basis of its argument the fact that defendant's dues were 75¢ per thousand square feet; that only 15¢ per thousand square feet was spent in technical activities including quality control and the remainder in promotion and other purposes. The price quoted defendant was greater than the calculated average cost per 1,000 square feet in defendant's whole operation. It is not shown however that defendant's actual cost of testing in a plant with a small production would have been less than the quoted price. For

13. The plaintiff did not prove that what defendant did with respect to Amendment No. 2 was initially directed at plaintiff. It was at some undisclosed time prior to April 21, 1958 that defendant's Management Committee adopted its resolution to sponsor Amendment No. 2. The record does not show that at the time this action was taken the plaintiff was in production (which commenced in November, 1957), or that the defendant knew that plaintiff was going to self-certify the 3-ply ½″ plywood produced by it.

this reason defendant's quoted price was not shown to be unreasonable.

Defendant had a right to deny to one not a member the use of its trade marks even if it did furnish the testing service. Plaintiff was not denied membership on the same terms as other members, and if it did not want to pay its share of the costs of defendant's promotion, it was not entitled to benefit from it. Plaintiff did secure the services of Timber Engineering Company for inspection and certification purposes.

It is therefore concluded that the defendant did owe the plaintiff a duty of testing at a reasonable cost; that there was no proof that the terms of defendant's offer were unreasonable; that in any event the plaintiff did not prove the defendant's failure in this respect proximately caused any damage since plaintiff did secure the services of another testing agency.

If the evidence on the matter of the testing services was introduced to prove defendant's intent to drive plaintiff out of the market, the court finds that it does not serve that purpose. The real dispute between the parties was the issue of the 3-ply ½″. Plaintiff felt persecuted because of defendant's actions on that issue and said harsh things about defendant, some of which may have been justified, but in any event ill will between the parties had developed by the time the testing problem arose and neither party wanted to deal with the other if there were any alternatives.

These conclusions are stated separately from the opinion in this matter because the plaintiff's contentions with respect to the testing are somewhat at variance with plaintiff's general theory. Plaintiff lost money in every year of operation. It attributed the losses to its production of items other than 3-ply ½″. Plaintiff's proof of damage was based upon projected production of nothing but 3-ply ½″. Plaintiff did not want the 3-ply ½″ tested unless defendant would certify it as commercial standard. The court cannot give weight to a claim based upon defendant's refusal to test a product which plaintiff strenuously urges it didn't want to make and on which it lost money. The plaintiff's case must stand or fall on what was done with respect to the 3-ply ½″ plywood.