**INGRAM CORPORATION et al.,**
**Plaintiffs-Appellees,**

v.

**The OHIO RIVER COMPANY,**
**Defendant-Appellant.**

**No. 73–1488.**

United States Court of Appeals,
Sixth Circuit.

Nov. 1, 1974.

---

John S. Stith, Cincinnati, Ohio, James G. Apple, T. Kennedy Helm, Jr., Louisville, Ky., for defendant-appellant.

William P. Schroeder, Cincinnati, Ohio, for plaintiffs-appellees.

Before WEICK and PECK, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

We consider the appeal of The Ohio River Company (Ohio), defendant in a suit in admiralty, from a judgment awarding damages to plaintiff, Ingram Corporation (Ingram), in the amount of $51,635.87 and to plaintiff, Texaco, Inc., in the amount of $7,145.01.[1] These

---

[1] Joined in this lawsuit as plaintiffs were Ingram Barge Company, the operating division of Ingram Corporation, and a number of insurance companies who might have had subrogation claims arising from the marine casualty here involved. No discussion of their interests is necessary to understanding of the issues involved. Ingram Corporation was the owner of the damaged barge and the vessel BROADFOOT. Judgment was entered in favor of Ingram Corporation.

damages allegedly arose as a consequence of a collision between a barge owned by Ingram and a barge owned by Ohio which had sunk and was lying beneath the surface of the Ohio River. The award to Ingram was for the cost of repairs to and the loss of use of its damaged barge and its vessel M/V (motor vessel) BROADFOOT. The award to Texaco was for its loss of a cargo of gasoline which was being transported in the damaged barge owned by Ingram. The involved vessels had, prior to the casualty, been underway upstream between Louisville, Kentucky and Cincinnati, Ohio. The location of Ohio's sunken barge was given as being opposite Mile 533.2. This means that the barge was five hundred thirty-three and two-tenths miles downstream from Pittsburgh, Pennsylvania. A vessel navigating upstream in this area would have Kentucky on its right or starboard side and Indiana on its left or port side.

The case was tried to District Judge David S. Porter sitting in the United States District Court for the Southern District of Ohio, Western Division, at Cincinnati. His Opinion and Order are reported as Ingram Corporation v. Ohio River Company, at 382 F.Supp. 481 (1974).

We affirm.

For their respective causes of action Ingram and Texaco charged first, that the captain of defendant Ohio's M/V (motor vessel) the ZIMMER, navigating upstream in the Ohio River, was negligent, in a maneuver which brought about the sinking of one of its barges and second, that Ohio was negligent in its failure to mark the location of such sunken barge in compliance with relevant rules of navigation.

Defendant's answer, denying the negligence charged to it, asserted that the captain and crew of Ingram's M/V BROADFOOT, also navigating upstream in the Ohio River, were guilty of negligence in proceeding to the point of collision, notwithstanding the knowledge that they had, or should have had, of the location of Ohio's sunken barge.

The tow of the ZIMMER (Ohio's boat) consisted of seventeen barges; fifteen of them were arranged forward of the ZIMMER in five rows of three barges each and there was one barge on each side of the ZIMMER. On Sunday, November 3, 1968, at about 2:30 a. m., this assemblage arrived at the vicinity of Markland Lock as a vessel ahead of it was in the process of locking through, and the ZIMMER had to await the other boat's clearance of the lock. To hold the ZIMMER and its barges from drifting during this period, the ZIMMER'S master decided to secure the front end of the tow against a sandbar on the Indiana side of the river at the mouth of Log Lick Creek. In attempting this action, however, he hit the sandbar so fast and hard that it became difficult to free his tow therefrom, and in an effort to overcome this problem, the ZIMMER'S engines were put in reverse and extra power was applied. As a consequence, the wheel wash from the ZIMMER began to flood the barge attached to the right—starboard—side of the ZIMMER, causing it to sink. Thereafter, the sunken barge, identified as the OR 740, was lying some seven to nine feet below the surface of the navigable channel of the river. So positioned, it was an obstruction to navigation and, as such, called for obedience to the provisions of the Wreck Act, 33 U.S.C. § 409, and regulations promulgated thereunder. Section 409 provides in part:

> "And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidently or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful;
> . . . ."

Regulations issued under § 409, 33 C.F. R., 64.01, provided:

"64.01-1 General.

(a) The owner of a vessel sunk in the navigable waters of the United States who fails to mark the wreck immediately for the protection of navigation with a buoy or daymark during the day and a light at night may in addition to being in violation of 33 U.S.C. § 409, be liable for resulting damage to the public. The owner of a sunken obstruction other than a vessel which creates an obstruction to the navigable capacity of any of the waters of the United States may, in addition to being in violation of 33 U.S. C. § 403, be liable for resulting damage to the public.

(b) The Coast Guard is authorized to mark for the protection of navigation any sunken vessel or other obstruction that is not suitably marked. Marking by the Coast Guard does not relieve the owner of any such obstruction from the duty and responsibility suitably to mark the obstruction and remove it as required by law.

§ 64.01-5 Marking by owners.

Buoys, daymarks, and lights established by owners of sunken vessels or other obstructions to mark such obstructions for the protection of navigation shall conform to the lateral system of buoyage prescribed by Subpart 62.25 of this chapter. Such markings shall be maintained until the obstruction is removed or the right of the owner to abandon is legally established and has been exercised."

The Ohio vessel, the ZIMMER, did not have aboard the buoys needed to comply with Section 409 and after being advised that such buoys were not available at the Markland Lock, its captain—Rogers —sought to provide substitute warnings. He found an empty grease can (36 inch-es in length and 16–18 inches in diameter) and anchored it on the upstream end of the sunken barge. An empty bleach (Clorox) bottle was similarly attached to the downstream end. Captain Rogers then requested that Markland notify the Coast Guard of the sunken barge. He then, at about 5:00 a. m., continued on his way and after locking through the Markland Lock proceeded upstream. At 9:30 a. m., Ohio's Captain Rogers called Ohio's office in Huntington, West Virginia informing it of the sunken barge and the markers which had been used.

The Coast Guard evidently received the news of the sunken barge (probably from Markland Lock) in the morning of November 3, 1968, and soon thereafter issued a notice to mariners which read as follows:

"SAFETY BROADCAST. USCG NOTICE TO MARINERS 2ND DIST NR 571. OR. THE LOCK MASTER AT MARKLAND LOCK AND DAM REPORTED A BARGE SUNK AT MILE 533.0 OHIO RIVER, IT IS MID CHANNEL 300 FT BELOW MARKLAND LIGHT COVERED WITH 6 OR 7 FEET OF WATER AND MARKED WITH A BLUE & WHITE OIL DRUM AT UPPER END AND A WHITE GALLON JUG AT LOWER END. CAUTION IS ADVISED."

Such messages were generally sent by teletype to two radio stations, one near St. Louis, and the other near Pittsburgh,[2] so that they could be periodically broadcast to river craft.

There was evidence that the above maritime notice was, in fact, broadcast periodically on November 3 and 4 on the Pittsburgh station, but the log of the St. Louis station was no longer in existence at the time of trial and there was no positive proof that the maritime notice,

2. Station WGK, a privately-owned commercial station, was located in Granite City, Illinois, and was commonly referred to as the "St. Louis station." Station WCM was also a private commercial station, located in Ir-win, Pennsylvania and referred to as the "Pittsburgh station." Both stations broadcast marine information for users of inland waterways.

NR 571, was broadcast from that station.

There was testimony by a man on duty at McAlpine Lock—one McCarty—that by radio he advised plaintiff's boat, the BROADFOOT, of the sunken barge and its location, and that he got an acknowledgment of his message from some unidentified member of the BROADFOOT crew. The captain of the BROADFOOT, as well as all members of the crew, however, denied receiving any messages, by radio or otherwise, telling of the sinking of Ohio's barge OR 740 and its location in the river. There was evidence, also, of many circumstances including poor atmospheric conditions and other natural phenomena which could have interfered with the crew of the BROADFOOT actually receiving any radio messages claimed to have been given. The District Judge fully considered all of these factors, and made a factual finding resolving, in favor of plaintiff, the issue of whether the BROADFOOT had received notice of the sinking of Ohio's barge and its location. His opinion sets out the reasoning which led him to that conclusion.

The Coast Guard sent a message to Ohio's office in Cincinnati by which Ohio was informed of its duty to mark the sunken barge. This message, sent on November 3, 1968, at about 9:30 a. m. stated:

"UNCLASSIFIED. INFORMATION HAS BEEN RECEIVED BY THIS OFFICE THAT YOUR BARGE OR 740 HAS BEEN SUNK AT MILE 533.0, OHIO RIVER. THE LAW REQUIRES THIS SUNKEN VESSEL TO BE MARKED BY A BUOY OR DAY MARK DURING THE DAY AND A LIGHT AT NIGHT. *YOU HAVE A LEGAL DUTY TO MARK THIS BARGE* UNTIL IT IS EITHER REMOVED OR YOUR RIGHT TO ABANDON IT HAS BEEN LEGALLY ESTABLISHED AND HAS BEEN EXERCISED AS PROVIDED IN 33 CFR 67.01.

"IF YOU CANNOT SUITABLY MARK THIS BARGE, THE COAST GUARD WILL UNDERTAKE MARKING AT YOUR EXPENSE IN ACCORDANCE WITH 33 CFR, 64.05. PLEASE ADVISE THIS OFFICE OF YOUR INTENTIONS REGARDING MARKING." (Emphasis supplied.)

At about 2:02 p. m., on the same date, the Coast Guard received a reply from Ohio saying: "Requested (sic) sunken barge be marked with lighted buoy as soon as possible." Subsequently, a Coast Guard cutter was dispatched to the site of the sunken barge, but it had to come from St. Louis, Missouri, and did not arrive at the scene until about three o'clock in the afternoon the next day, November 4th, some 33 hours after the sinking of the OR 740 had occurred. We should here emphasize, in support of the District Judge's finding of negligence, that neither the Ohio River Company nor any of its agents did anything to protect traffic on the Ohio River after the above-described request to the Coast Guard. Thus, the makeshift marking by the grease can and Clorox bottle remained as the only visible warning to river craft for more than a full day.

On November 4th, the plaintiff's Motor Vessel BROADFOOT, owned by Ingram, was underway upstream in the Ohio River, on a trip from Mount Vernon, Indiana, to Cincinnati, Ohio. In its tow were four gasoline and fuel barges. After dropping two of them at Louisville, the BROADFOOT continued upstream and locked through what is identified as McAlpine Lock and Dam at 4:30 a.m. and was approaching the Markland Lock, which is located upstream from McAlpine Lock. The BROADFOOT'S captain, Saunder Brooks, at about 6:00 a.m., had relieved the pilot who had been navigating the BROADFOOT. He was travelling against a slow current at a speed of 9 miles per hour, and from a distance of about one mile he noticed the grease

drum and Clorox bottle through his binoculars. Captain Brooks testified that he did not consider that these objects had a purpose of marking an obstruction to navigation, and that he assumed that they were debris commonly seen on the river. He said, however, that he was aware that at times such makeshift markings were employed awaiting opportunity for correct obedience to the applicable statute and regulations. At 11:45 a.m., on November 4th, the BROADFOOT'S tow struck Ohio's sunken barge. As a result, Ingram's barge — the Illinois — was damaged and its cargo of gasoline poured into the river.

The barge Illinois was out of service for repairs from November 4 to December 4. The vessel, the BROADFOOT, was delayed 3½ days at the scene of the collision and while Ingram's barge was being repaired at Paducah, Kentucky, the company lost the profits that use of the barge would have produced.

We summarize the issues for review as presented by appellant as follows:

"(1) Whether appellant was negligent in the sinking and marking of its barge;

"(2) Whether appellant's negligence was the proximate cause of the collision of Ingram's tow and barge;

"(3) Whether the negligence of both appellant and appellee caused the collision requiring the application of the divided damages rule;

"(4) Whether damages awarded were properly calculated by the District Court."

## I. THE STANDARD FOR REVIEW

■ The District Judge held that appellant's master was negligent both in running appellant's tow too hard against the sandbar and in his subsequent maneuver which brought about the sinking of its barge. He found negligence also in Ohio's failure to take the steps necessary to properly mark the location of the sunken barge. The findings of fact necessary to such holdings must, under Rule 52(a), Fed.R.Civ.P., be sustained on re-

view unless they are clearly erroneous. Appellant contends, however, that because much of the evidence presented in this case was by deposition, the above rule does not control a reviewing court, and our consideration of this admiralty case should be in the nature of a de novo hearing.

In United States Steel Corp. v. Fuhrman, 407 F.2d 1143 (6th Cir. 1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970), Judge Phillips speaking for this Court, recognized the division between the circuits on this question and held that the clearly erroneous rule should control even where the entire record consisted of "depositions, Coast Guard records, and other written material." We have adhered to this rule in the later cases. Lambros v. Commissioner, 459 F.2d 69, 72 (6th Cir. 1972); H. K. Porter Co. v. Goodyear Tire and Rubber Co., 437 F.2d 244, 246 (6th Cir. 1971), cert. denied, 404 U.S. 885, 92 S. Ct. 203, 30 L.Ed.2d 169 (1971). We adhere to these decisions now.

## II. DEFENDANT'S NEGLIGENCE

■ We find no error in the District Judge's finding that appellant's master was negligent in the conduct which brought about the sinking of the barge OR 740. This finding could have been legitimately predicated first upon the manner of the attempt to secure the head of the ZIMMER'S tow in the sandbar and secondly upon the means thereafter employed to undo the consequence of the original negligence.

The District Judge also found negligence in the failure of Ohio and its agents to make or secure required markings of the location of its sunken barge. We have set out hereinabove the applicable section of the Wreck Act, 33 U.S.C. § 409, which cast upon the owner of the vessel ZIMMER and its barges the duty to

". . . immediately mark it [the sunken craft] with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks

until the sunken craft is removed or abandoned. . . ."

Regulations promulgated under the statute provide:

"(a) The owner of a vessel sunk in the navigable waters of the United States who fails *to mark the wreck immediately* for the protection of navigation with a buoy or daymark during the day and a light at night may, in addition to being in violation of 33 U.S.C. § 409, be liable for resulting damage to the public. . . ."

"(b) The Coast Guard is authorized to mark . . . any sunken vessel . . . that is not suitably marked. Marking by the Coast Guard *does not relieve the owner of any such obstruction from the duty and responsibility suitably to mark* the obstruction and remove it as required by law." (Emphasis supplied.) 33 C.F.R. 64.01–1(a) and (b).

Appellant relies in part upon an excerpt from a Coast Guard publication identified as the Mississippi River Light List. This excerpt, after describing the statutory obligation of an owner to mark an obstruction to navigation, adds this caveat:

"*Provided,* that until the owner has an opportunity to establish such standard markings, *he shall maintain the most suitable markings available under the circumstances which will warn the navigator of the sunken wreck.*" (Emphasis in the original.)

The District Judge was of the view that this proviso did not absolve the master of .the appellant's vessel from fault. As we read it, the above provision permits the use of "the most suitable markings" until and only until the owner has had opportunity to see to the establishing of a suitable marking— the marking required by the statute. We need not here determine whether the grease can and Clorox bottle could be considered "the most suitable markings." They were indeed not sufficient to warn the master of plaintiff's vessel, the BROADFOOT, whose captain

saw them but considered them merely debris on the water's surface. It could be legitimately inferred that the BROADFOOT'S captain, an experienced river pilot, would not have proceeded as he did had he considered the markings, the grease can and Clorox bottle, as warning that a sunken barge was in his path. Indulging an assumption that the ZIMMER'S captain did the best he could in the immediacy of the danger that was his own creation, he and his employer had ample time thereafter to make sure that an adequate warning was provided. Their total conduct was first to ask those on duty at the Markland Lock to notify the Coast Guard. The ZIMMER then proceeded on its way without any assurance that the Coast Guard would act as its substitute in providing proper markings. We note again that regulations issued under the governing statute provide that:

". . . Marking by the Coast Guard does not relieve the owner of any such obstruction from the duty and responsibility suitably to mark the obstruction. . . ." 33 C.F.R. 64.01–1(b).

The Cincinnati Office of Ohio had been advised by the Coast Guard, "You have a legal duty to mark this barge until it is either removed or your right to abandon it has been legally established." The Coast Guard's message also said, "If you cannot suitably mark this barge, the Coast Guard will undertake marking . . . ." The appellant then sent a message to the Coast Guard requesting that "the sunken barge be marked with a lighted buoy as soon as possible." This was Ohio's last attention to the matter.

Ohio's office in Cincinnati was only a one and one-half to two hour drive by land from the location of the sunken barge and one or more of Ohio's employees did, in fact, make the trip on November 3rd or 4th. It may fairly be inferred that appropriate markings, buoys and lights could have been obtained at Cincinnati, but Ohio paid no heed to the sunken barge after asking

the Coast Guard to undertake the placing of the required markings. It did not inquire as to when the Coast Guard might carry out its request.

▇ Appellant relies on Petition of Anthony O'Boyle, Inc., 161 F.2d 966 (2d Cir. 1947), where the Second Circuit said:

> "[W]e note, in passing, the reasonableness of Miss O'Boyle's assumption that notification of the Coast Guard was equivalent to a request that they mark the wreck; *such a request would probably have been sufficient to discharge O'Boyle's duty to mark.* See The Plymouth, 2 Cir., 225 F. 483." 161 F.2d at 967. (Emphasis supplied.)

That case, like the present, involved an allegation of failure to properly mark a sunken barge. However, in *O'Boyle* both the sunken barge and the one which later hit it were in the same tow, and the focus of decision was on the fact that the tow boat had been negligent in striking its own barge.

The Second Circuit re-examined the position taken in *O'Boyle* in the case of Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665, 669 (2d Cir. 1951), where it was stated:

> "Although the Coast Guard's search for the wreck may, if made with due diligence in the light of the facts within the knowledge of the owner, operate to discharge the owner's duty, the mere fact that the Coast Guard undertakes a search does not relieve the owner of liability for failure to make all reasonable efforts to mark. . . . The dicta in Petition of Anthony O'Boyle, Inc., 2 Cir., 161 F.2d 966, 967, and Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77, 79, which may indicate the contrary should be discounted accordingly."

See also Morania Barge No. 140, Inc. v. M. & J. Tracy, Inc., 312 F.2d 78, 83 (2d Cir. 1962).

We believe the position taken by the Court in *Berwind-White* is correct; it is consistent with the rule that the duty to properly mark under the Wreck Act is non-delegable. *See, e.g.,* Elizabeth Co. v. Mesick & Mesick, Inc., 298 F. 743, 744 (2d Cir. 1924); The Anna M. Fahy, 153 F. 866, 868 (2d Cir. 1907); The Snug Harbor, 53 F.2d 407, 411 (E.D.N.Y. 1931).

We find no circumstances in the case before us which would dictate a result contrary to the rule of *Berwind-White.* Appellant clearly had reasonable time to mark the barge. As pointed out by the District Court,

> "It must be recalled that the Coast Guard was in St. Louis and the vessel Lantana which was dispatched November 3, 1968, to mark the barge with lighted buoys had hundred (sic) of miles to go to the scene of the wreck. Hence, on reason, as well as authority, it would make no sense to conclude that notification of the Coast Guard relieved the owner of liability."

The findings of fact upon which the District Judge predicated negligence of defendant are not clearly erroneous. We are of the view that there was evidence upon which Ohio could be found negligent not only in the style of its captain's attempt at makeshift marking, but also in its apparent indifference to its responsibilities after it had asked the Coast Guard to provide proper markings. Moreover, we agree that the facts found in the case at bar warranted the conclusion that defendant's negligence was a proximate cause of the casualty involved.

### III. ALLEGED NEGLIGENCE OF PLAINTIFF INGRAM

▇ If the crew of the BROADFOOT were guilty of negligence which joined with that of defendant in bringing about the casualty, all damages suffered by the parties would, under the American rule, be borne in equal shares by appellant Ohio and appellee Ingram.

We have discussed hereinabove the evidence which defendant contends should have led to the conclusion that Ingram

was guilty of contributory negligence. This evidence consists primarily of the fact that the captain of plaintiff's vessel saw the grease can and Clorox bottle through his binoculars when he was about one mile below the sunken barge. In addition, there was evidence that grease cans had, in the past, been used as a means of emergency marking of an obstruction to navigation; but, on the other hand, there was evidence also that navigators frequently proceed past such things when concluding that they are but debris floating on the river's surface. Certainly, had the makeshift markings been adequate notice of the presence of the sunken barge, good seamanship would have suggested to a reasonably careful river pilot that he could not navigate into that part of the area until he could be assured of the safety of such conduct. The BROADFOOT'S captain testified to his belief that what he saw was debris, and it was for the District Judge to determine whether this version of his conduct was believable and credible. He concluded that it was. In dealing with a somewhat similar factual background in The E. M. Millard, 285 F. 94 (E.D.N.Y.1922), the Court stated:

"There is nothing in the record to justify a finding that a coffee can is a proper buoy. It is a matter of common knowledge that floating cans of various sorts are not uncommon in the harbor of New York . . . This accident occurred in a place where there should be no difficulty in placing at once the kind of buoy required by the regulations of the Lighthouse Service in a case of a sunken wreck, to wit, a spar buoy painted with red and black horizontal stripes. *The respondent had ten hours in which to anchor such a buoy. Its failure is negligence, and the failure of the tug captain to see and interpret a coffee can as indicating a sunken wreck in the harbor of New York was not negligence on his part.*" 285 F. at 95. (Emphasis supplied.)

Appellant further asserts that its evidence that warnings were given by radio as to the location of its sunken barge were in fact received by the crew of appellee's vessel, the BROADFOOT, should have prevailed over the denial by all of the crew of the BROADFOOT that no such warnings were received. The District Judge's opinion recites his consideration of this conflict and he resolved it in favor of the plaintiff. We have read the testimony relevant to this factual conflict as well as the District Judge's resolution of it, and we are not persuaded that he was incorrect. We note specifically that the BROADFOOT'S captain —Brooks—testified that he contacted the Markland Lock and Dam about five minutes before the collision, and that he received no warning of the sunken barge at that time.

Accordingly, we hold that the District Court's conclusion that appellee Ingram Corporation was not negligent finds adequate support in the record and is based on factual findings which are not clearly erroneous within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure.

## IV. DAMAGES

For the most part, the damages awarded by the District Court were either stipulated or have not been challenged on this appeal. The agreed-upon damages were as follows: Texaco's loss of fuel in the amount of $7,145.01; and physical damage to appellee's barge Illinois in the amount of $36,178.87. The damage awards claimed to be in error are for: (1) loss of use of the barge Illinois while it was undergoing repairs ($8,052.00); (2) loss of use of M/V BROADFOOT and its tow for the three and one-half day period during which she was delayed at the scene of the collision ($5,339.00); and (3) expenses incurred in transporting the barge Illinois from Paducah, Kentucky, where it was repaired, to Mount Vernon, Indiana, for return to service ($2,066.00).

■ It is the rule in maritime cases that recovery for loss of use is permitted upon proper showing of such loss. *See, e. g.,* Agwilines, Inc. v. Eagle Oil & Shipping Co., 153 F.2d 869, 870 (2d Cir. 1946); Sinclair Refining Co. v. The America Sun, 188 F.2d 64 (2d Cir. 1951); The Gylfe v. The Trujillo, 209 F.2d 386 (2d Cir. 1954). As stated by the Court in Sinclair Refining Co. v. The America Sun, *supra,* 188 F.2d at 66–67:

> "Whatever the method employed [in calculating loss], it should be one that is reasonably adapted to the circumstances of each case so that there will, on the one hand, be no failure to award damages suffered and, on the other, no unreasonable award based upon some theoretical concept of loss."

■ With respect to the first contested element of damages (loss of use of the barge Illinois), it was shown at trial that the Illinois was one of four barges built by appellee to transport fuel products for Texaco.[3] The Illinois was delivered to appellee in August of 1968, and in the months preceding the collision, it averaged 3.5 trips per month between Mount Vernon, Indiana and Cincinnati. On such trips, appellee received one dollar per short ton for the transportation of the fuel. Based on the average capacity of the Illinois on previous trips, it was estimated that this barge produced income of $3,122.58 per trip.

Vladimir Slicho, Ingram's traffic manager, testified that during the time the Illinois was under repair—November 4 to December 4—the BROADFOOT made three trips, two of which were made with its three remaining fuel barges, and one on which appellee chartered an extra barge. Although on two trips the BROADFOOT had only three barges in tow, its operating expenses remained the same as when it operated

four barges. Based on these factors, it was shown that appellee incurred losses of $3,122.58 on each of the first two trips, and $2,582.04 on the trip for which an extra barge was rented, for a total of $8,827.20.

Upon this element of damages, the District Court made its award in the following manner:

> "As to the plaintiff's claim for loss of use of the Barge Illinois on the three trips dated November 13, 20, and 26, 1968, no discussion is necessary, because the plaintiff appears willing to accept the lowest reasonable alternative of the defendant in calculating such loss of use, so the Court goes along with that. This is in the sum of $8,052."

In our review of the record, we have not found evidence that, at trial, defendant-appellant proposed, nor that plaintiff-appellee acquiesced in, the specific sum of $8,052.00, but the record amply supports a recovery of that magnitude. Slicho, an official of the Ingram Corporation, testified that during the term of the contract in force at the time of the collision, there was never an occasion when Texaco did not have sufficient fuel to fill a full tow, and it is clear that Texaco had such a supply to be transported while the Illinois was under repair. Although the BROADFOOT made two trips with three—rather than the usual four—barges, Slicho stated that expenses were fixed, that no savings resulted from the reduced size of the tow and that every effort was made to charter an additional barge at the earliest possible opportunity. In its brief, Ingram relies, of course, upon the above-described calculation, derived from Slicho's testimony, showing a loss of $8,827.20, but Ingram also urges that the award of $8,052.00 was not clearly erroneous. We agree.

3. Under a contract entered into between appellee Ingram and Texaco, effective April 27, 1968, appellee agreed to "place a tow of sufficient capacity in service to handle [Texaco's] transportation requirements" for petroleum products. (Plaintiff's Exhibit 1).

It was because of this commitment by appellee that the four barges, including the Illinois, were acquired.

With regard to the loss of use of the BROADFOOT and its tow, our inquiry is, again, a limited one. Slicho's testimony that Texaco had a constant supply of fuel to be transported, is relevant. There had been no time in the past when the BROADFOOT lacked fuel to transport, and the normal complete trip took approximately seven days. Downtime at the wreck was three and one-half days. The District Judge found that the average profit from a complete trip was $10,678.00, and based upon the above data, he determined that Ingram was entitled to one-half of the full-trip profit, or $5,339.00.

The major conflicting evidence was in the fact that from the beginning of the contract (April 1968) until December 1968, the BROADFOOT'S trips did average more than seven days. The record is unclear as to why this occurred, although Slicho did suggest that some time may have been spent in overhauling and repairing the equipment. Apparently no such overhaul occurred during October. There was also evidence that delays were experienced periodically on all trips of the BROADFOOT. Such delays, however, were presumably included in the seven-day average time for a trip.

Based on the above facts, we do not regard the award of profits for three and one-half days—half the average time needed to make a trip—as being unreasonable. The award of $5,339.00 is therefore sustained.

Similarly, allowance of $2,066.00 for transportation of the barge Illinois from the repair site at Paducah, Kentucky, to Mount Vernon, Indiana, was deemed reasonable by the District Judge as an expenditure made for the purpose of avoiding loss of profit. Appellant has offered nothing to indicate that this result was clearly in error.

In awarding damages, the District Court sought to make appellee Ingram whole for deprivation of the use of its equipment and for unavoidable expenses, both of which were caused by the negligence of appellant Ohio Company. We have examined appellant's alternative methods of valuing appellee's losses, and we are not persuaded that they are more accurate or more reliable than the methods adopted by the Court below.

The judgment of the District Court is affirmed. Allowable costs shall be taxed to appellant.