**ELIASON CORPORATION,**
Plaintiff-Appellant,

v.

**NATIONAL SANITATION FOUNDA-TION et al., Defendants-Appellees.**

No. 77–1590.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 1, 1979.

Decided Feb. 4, 1980.

Lee Boothby, Berrien Springs, Mich., for plaintiff-appellant.

Nathan B. Goodnow, Robert G. Cutler, Dykema, Gossett, Spencer, Goodnow & Trigg, Eugene D. Kirkby, Detroit, Mich., Thomas C. Clarke, Buchanan, Mich., and MacDonald Flinn, White & Case, New York City, John F. McClatchey, Thomas J. Collin, Cleveland, Ohio, and Richard B. Gushee, Miller, Canfield, Paddock & Stone, Detroit, Mich., Leslie W. Jacobs, Isidore Friedman, and Frederick W. Scholem, New York City, Theodore Souris, Bodman, Longley, Bogle & Dahling, Detroit, Mich., for defendants-appellees.

Before EDWARDS, Chief Judge, WEICK and LIVELY, Circuit Judges.

WEICK, Circuit Judge.

The plaintiff-appellant, Eliason Corporation (Eliason), brought this antitrust action in the District Court for the Eastern District of Michigan against the National Sanitation Foundation (NSF), the National Sanitation Foundation Testing Laboratory (NSFTL), six of its competitors or potential competitors, the National Restaurant Association, numerous health officials as a class (for purposes of injunctive relief), and nine named individuals. The complaint charged that the defendants have engaged in an unlawful conspiracy "the necessary result of which has been and is to cause purchasers and users of products which have a relation to or bear on public health and sanitation to refuse to deal with manufacturers of such products who are not approved by NSF, and to refuse to purchase such products which do not carry the seal of approval of NSF." The plaintiff asserted that this alleged conduct amounted to a group boycott of all manufacturers including plaintiff not approved by NSF in violation of §§ 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2). The plaintiff prayed for treble damages and injunctive relief.

The parties participated in extensive discovery over a period of four years and developed a massive record consisting of depositions of 26 witnesses and thousands of pages of exhibits. In order to expedite and facilitate consideration of the case, the parties modified normal trial procedures. It was agreed that the trial would be bifurcated and that the court would first consider the issue of whether the defendants violated §§ 1 and 2 of the Sherman Act, "reserving the future determination, if need be, the issues of the impact upon plaintiff of any such violation and the damages, if any, suffered thereby by plaintiff." The agreement also specified that the plaintiff would be given an opportunity to make an oral summation of the evidence to the court. However, due to a misunderstanding, the District Court adopted Findings of Fact, and Conclusions of Law and entered judgment for the defendants before the oral summation was made. These findings were almost identical with the defendant's proposed findings. The plaintiff filed a motion for reconsideration based on the fact that it was not afforded the opportunity to make an oral argument. The court granted the motion and suggested that the first set of findings and conclusions be treated as preliminary. After three days of oral argument to the court, District Judge Joiner adopted Final Findings of Fact, Conclusions of Law and entered judgment for the defendants. These findings had modified in some respects the earlier findings. Because of the importance of the facts to the issues in this appeal we have given careful consideration to the lengthy record.[1]

---

1. Eliason contends that because the case was decided on a paper record involving no opportunity for credibility assessments by the District Court because no witness testified in open

## I

The National Sanitation Foundation was founded as a nonprofit organization in 1944 for the purposes of research, education, and standard development in the field of health and sanitation. The NSF program was modelled and developed after the standard and certification programs of the Underwriters Laboratories (UL) and the American Gas Association (AGA). Although NSF has promulgated more than 40 standards covering a wide variety of products, only one standard, Standard 7, and one proposed standard are relevant to this case.[2] The NSFTL was organized in 1952 as a subsidiary of NSF to engage in special research projects and to test products to determine if they comply with the appropriate NSF standards. NSFTL issues a seal of approval to complying products. NSFTL also compiles and distributes lists of complying products to public health officials, architects, food service consultants, and product purchasers. Eliason does not challenge the reasonableness of the standards either in content or application, rather it focuses its attack on the testing programs.

Any manufacturer, whether or not it participated in the formulation of the standard, may submit its equipment to NSFTL for testing. The manufacturer must enter into a contract with the NSFTL and pay certain fees which are not claimed to be unreasonable. The products must undergo annual re-inspection in order to retain approved status. Compliance is strictly enforced by NSFTL. Immediately upon receipt of a complaint that a product bearing the seal does not meet NSF standards, NSFTL investigates the complaint. If the product does not comply with the standard, the manufacturer must either bring the product into compliance or remove the seal.

Eliason manufacturers walk-in refrigerators and freezers for sale to food markets. Shortly after Standard 7 was promulgated, Eliason submitted an application to NSFTL to have a walk-in unit tested. Eliason was informed at a very early stage that its equipment did not comply with the Standard without some design modifications.[3] Eliason was permitted to withdraw its application and its money was refunded. There is no evidence that NSFTL is controlled by the plaintiff's competitors or that Eliason was required to meet a different standard than the one applied to its competitors. Nor has Eliason ever been barred from participating in any of the NSF or NSFTL programs.

## II

Eliason contends that the acts of the defendants in establishing and promoting the seal of approval and listing programs of the NSFTL constitute a group

---

court we should undertake a determination *de novo* of the facts from the record. This would invade the province of the trial court. This Circuit has consistently held that, even where a paper record is involved, the standard of review is whether the findings of fact of the District Court are supported by the substantial evidence and are not clearly erroneous. Application of this standard preserves the proper relationship between trial and appellate courts. *Ingram Corp. v. Ohio River Co.*, 505 F.2d 1364 (6th Cir. 1974); *Lambros v. Commissioner*, 459 F.2d 69, 72 n.2 (6th Cir. 1972); *H. K. Porter Co. v. Goodyear Tire & Rubber Co.*, 437 F.2d 244, 246 (6th Cir.), *cert. den.*, 404 U.S. 885, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971); *U. S. Steel Corp. v. Fuhrman*, 407 F.2d 1143 (6th Cir. 1969), *cert. den.*, 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970).

**2.** Standard 7 does not directly apply to products currently manufactured by Eliason, but it does apply to products in the market from which the plaintiff claims to have been excluded. The proposed standard would directly apply to products manufactured by Eliason. Eliason claims that Standard 7 has occasionally and erroneously been applied to its products by certain health officials. While this may be true, there is no evidence that any of the defendants are responsible therefor. In fact NSF went out of its way to clarify the proper scope of Standard 7. Tyler dep. at 17–18; Gable dep. at 139–40, 201–02, 324–29; Hilbert dep. at 97–99.)

**3.** All or nearly all of the manufacturers participating in the program had to make design changes in order to comply with the NSF standard in issue. Eliason failed to comply with the requirement that corners be coved and non-galvanized steel be used. There are substantial health justifications for incorporating these requirements.

boycott of all products not tested by NSFTL and urges the application of a *per se* rule. While the increasing use of and demand for NSFTL approval of products makes marketing of non-approved equipment more difficult, this alone does not prove a *per se* violation of § 1 of the Sherman Act. Where the alleged boycott arises from standard-making or even industry self-regulation, the plaintiff must show either that it was barred from obtaining approval of its products on a discriminatory basis from its competitors,[4] or that the conduct as a whole was manifestly anticompetitive and unreasonable.[5] There is no evidence of discrimination or exclusion in this case.

In *Roofire Alarm Company v. Royal Indemnity Company*, 202 F.Supp. 166, 169 (E.D.Tenn.1962), District Court Judge Frank W. Wilson was faced with an antitrust challenge to the Underwriters Laboratories (UL) standard-making and testing program. In applying the applicable rule of reason standard, the court said:

> The action of Underwriters Laboratories, Inc., appears to be for lawful and proper purposes. Even if the defendant participates with or through others in the setting of the standards adopted by Underwriters Laboratories, Inc., there is nothing to indicate that this has accomplished any unlawful or improper purpose. Rather, the defendant's connection with Underwriters Laboratories, Inc., and with other related organizations likewise appears to be for lawful and proper purposes. . . . An association formed to foster high standards, to mitigate evils in trade existing through lack of knowledge or information, and to encourage fair competitive opportunities is not to be condemned as an undue restraint of interstate commerce in violation of the Sherman Act merely because it may effect a change in market conditions, 36 Am.Jur. Monopolies, Sec. 148. The Act sets such standards of reasonableness, and a restraint is not unlawful unless it is unreasonable. (202 F.Supp. at 169).

A panel of this court consisting of Lester Cecil, Chief Judge, Shackelford Miller, Jr., and Clifford O'Sullivan, Circuit Judges affirmed the judgment of the District Court by order "for the reasons set forth in the opinion of the trial judge." 313 F.2d 635 (6th Cir. 1963), *cert. den.*, 373 U.S. 949, 83 S.Ct. 1678, 10 L.Ed.2d 704 (1963).

The burden was upon the plaintiff to prove that the conduct alleged to constitute a violation of the antitrust laws was both unreasonable and restrained competition. The plaintiff's proof in this case failed on both counts. The District Court expressly found that NSF standards were developed to promote uniformity in the health requirements that products are required to meet in different jurisdictions. This uniformity helps promote nationwide competition and enables manufacturers who elect to comply with NSF standards to be reasonably sure that they will not have to modify their product in order to meet the different requirements of many jurisdictions. Eliason contends, however, that even if the standards themselves are reasonable and procompetitive that the testing service offered by NSFTL together with the seal of approval and listing programs are *per se*

---

4. *See, Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Silver v. New York Stock Exchange*, 373 U.S. 341, 348–49, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); and *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee et al.*, 467 F.2d 178, 187 (5th Cir. 1972), *cert. den.*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

5. *Roofire Alarm Company v. Royal Indemnity Company*, 202 F.Supp. 166 (E.D.Tenn.1962), *aff'd*, 313 F.2d 635 (6th Cir. 1963), *cert. den.*, 373 U.S. 949, 83 S.Ct. 1678, 10 L.Ed.2d 704 (1963); *Bridge Corp. of America v. American Contract Bridge League, Inc. et al.*, 428 F.2d 1365 (9th Cir. 1970); *Worthen Bank and Trust Co. v. National Bankamericard Inc.*, 485 F.2d 119 (8th Cir. 1973); *Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646 (5th Cir. 1977); *Smith v. Pro Football, Inc.*, 193 U.S.App.D.C. 19, 23–28, 593 F.2d 1173, 1177–82 (D.C. Cir. 1978); *Neeld v. National Hockey League*, 594 F.2d 1297 (9th Cir. 1979). *See also, Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

anticompetitive and unreasonable because they tend to exclude nonapproved products from the market. We disagree. We are of the opinion that the testing services and the seal of approval and listing programs cannot so easily be separated from the standards they are designed to supplement and enforce. *Underwriters Laboratories v. United Laboratories*, 203 U.S.P.Q. 180, 183 (N.D.Ill.1978). Many states do not have adequate facilities to properly test whether or not a product complies with NSF health and safety standards. NSFTL's testing program helps to promote uniformity in the interpretation and application of the standards. The fixation of a seal of approval on the product or the listing of the product in a widely distributed publication only further assures the pro-competitive goal of nationwide acceptance of the product. These are all legitimate means of promoting NSFTL's testing service.[6]

Other factors to be considered in analyzing the reasonableness of standard-making and testing programs lead us to the same result. The practice of treating NSFTL approval of a product as *prima facie* evidence of compliance with local standards avoids waste of time and money for duplicative testing in many different jurisdictions. NSF standards are periodically revised so that no product of adequate sanitary quality is excluded from qualifying for the seal of approval. NSF and NSFTL have never disparaged the quality of products which they have not tested. NSF and NSFTL are independent organizations and are not dominated or controlled by manufacturers of any one product. They are not in direct competition with the plaintiff and have no intent to exclude plaintiff from

competition. We agree with the District Court's holding that no unreasonable restraint of trade was shown by the evidence.[7]

## III

Eliason also claims that the defendants violated § 2 of the Sherman Act by exerting collective monopoly power to exclude it from the nationwide market in products governed by Standard 7. The District Court found that Eliason had not set forth facts sufficient to prove the product and geographical markets in which the defendants were claimed to have monopoly power. Resolution of this issue is made more difficult by the reservation of the issue of injury to the plaintiff for future determination if necessary as proof of injury helps to define the relevant product and geographical markets in which the plaintiff's product competes. It is certainly true that the plaintiff must be held to a higher degree of proof where it is attempting to prove a very restricted product or geographical markets. Here the plaintiff has conceded that it must prove monopoly power in a nationwide market for all products covered by Standard 7.

We are unable to find any violation of § 2 of the Sherman Act. We are convinced NSF and NSFTL have not exercised monopoly power to exclude manufacturers from any relevant market; that the benevolent powers possessed by NSF and NSFTL are due to their non-partisan performance and the high reputation enjoyed by them and their individual members in the field of public health and sanitation

6. We do not intend to foreclose the possibility that some standards may be so unreasonable in content that their net effect injures competition even though some policies of uniformity are served. This is not the case here.

7. *See also, Structural Laminates, Inc. v. Douglas Fir Plywood Ass'n*, 261 F.Supp. 154 (D.Or. 1966), *aff'd*, 399 F.2d 155 (9th Cir. 1968), *cert. den.*, 393 U.S. 1024, 89 S.Ct. 636, 21 L.Ed.2d 569 (1969); and *United States v. Johns-Manville Corp.*, CCH 1967 Trade Cases, para. 72, 184 (E.D.Pa.1967).

In light of our disposition of this case, we need not address the applicability of the *Parker v. Brown* and *Noerr-Pennington* immunity defenses in this case. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *Eastern Railroad President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

including the objectivity of the test results.[8] We can find no evidence that there has been any abuse of this monopoly power or even any intent to monopolize.

In our opinion, the findings of fact adopted by the District Court in respect to the alleged violations of §§ 1 and 2 of the Sherman Act are supported by substantial evidence and are not clearly erroneous.

The judgment of the District Court is affirmed for the additional reasons set forth in its findings of fact and conclusions of law.

---

**8.** Even a monopolist which achieves that status because of a superior product, business acumen, or historical accident cannot be faulted. *Byars v. Bluff City News Co.*, Sixth Circuit slip opinion filed October 16, 1979 (Case No. 77–1227); *United States v. Grinnell Corporation*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).