**CONSOLIDATED METAL PRODUCTS, INC., Plaintiff–Appellant,**

v.

**AMERICAN PETROLEUM INSTITUTE, Defendant–Appellee.**

No. 87–1200.

United States Court of Appeals, Fifth Circuit.

June 6, 1988.

Philip J. Hirschkop, Jonathan R. Mook, Alexandria, Va., for plaintiff-appellant.

James J. Bierbower, Roy D. Snyder, Jr., Wash., D.C., for American.

Arnold S. Block, Wash., D.C., for Dover Corp.

Before WISDOM, GARWOOD, and JONES, Circuit Judges.

WISDOM, Circuit Judge:

In this suit, Consolidated Metal Products, Inc., a manufacturer of oil well equipment, contends that the American Petroleum Institute ("API"), a trade association representing all sectors of the domestic petroleum industry, delayed trade standard certification to certain equipment manufactured by Consolidated and thereby excluded it from the market in violation of section 1 of the Sherman Act. 15 U.S.C. § 1. After a thorough review of the evidence, the district court granted summary judgment for API. Although Consolidated offered evidence that API had no basis to conclude that its equipment would not perform up to trade standards, the district court found this insufficient to raise a genuine issue of fact material to whether the delay was a conspiracy in restraint of trade. Consolidated appeals.

The principal question in this case is whether unjustified denial of a valuable product certification by a standard-setting body, without more, violates section 1 of the Sherman Act. We hold that it does not and affirm the judgment of the district court.

## I.

Sucker rods are part of the equipment used to pump oil from wells having low natural pressure. A pump jack at the surface imparts an up-and-down motion to a sucker rod string that extends through the tubing of the well to a pump submerged in the fluid of the well. Each sucker rod is 25 to 30 feet long, ½ to 1⅛ inches in diameter, and has coupler heads on each end. The heads allow the rods to be strung together inside the tubing until they reach the submerged pump.

Conventional sucker rods are manufactured of a single piece of steel. First, steel is forged into a shaft. Then, the ends of the shaft are hot-forged into coupler heads, making a one-piece sucker rod.

In 1980, when domestic oil production and the demand for sucker rods were at record levels, Consolidated developed an innovative method for manufacturing the rods. Using its patented high-strength steel, Consolidated manufactured the rods in three individual pieces: the steel shaft and two threaded coupler heads. Consolidated then roll-threaded the coupler heads onto the steel shaft. Because this process eliminated the costly hot-forging required by the conventional design, Consolidated's rods were cheaper to produce than conventional rods. Consolidated began marketing its rods in 1981, and that year sold nearly 12 million feet of them—a substantial amount.

In addition to its various other activities, API is the only domestic body that sets standards for oil field equipment. Equipment manufacturers may apply to API for approval of their products and, if API finds that the equipment meets its standards, it will (for an annual fee) grant a license to display the API monogram on the equipment. The monogram is a registered trademark of API. By using it, the licensee warrants to purchasers that the monogrammed product complies with API specifications. The API monogram has commercial value in that its use enhances product sales.

API has been setting standards for, and approving, sucker rods since at least 1927. API approval of products is not, however, required by any law and oil field equipment, including sucker rods, is sold without it.

Consolidated had been selling sucker rods without the API monogram for some time when, after several initial inquiries, it formally applied to API for approval of its innovative rod design on June 1, 1981. Around the same time, other manufacturers who had been marketing unconventional sucker rods also applied for API approval. These other new rods included a three-

piece design in which the coupler heads were welded, rather than roll-threaded, onto the steel shaft.

J.M. Spanhel of the API production department staff was authorized to grant or deny sucker rod manufacturers the license to use the API monogram.[1] Spanhel was familiar with the three-piece threaded design from Consolidated's earlier inquiries with API. He told Consolidated that he thought its design was not contemplated by API's sucker rod specifications, contained in API Spec. 11B,[2] but nonetheless arranged for Consolidated to make presentations to API's sucker rod standards committee.

The sucker rod standards committee referred the applications of Consolidated and the other three-piece rod manufacturers to the manufacturer subcommittee. After hearing presentations by the applicants, the manufacturer subcommittee deferred all action to the user subcommittee. The user subcommittee met on June 24, 1981 to consider the various applications and heard presentations by several sucker rod manufacturers, including Consolidated. Spanhel asked the user subcommittee to determine how the requirements of Spec. 11B should be applied to Consolidated's rod. The minutes of that meeting state:

> The User Subcomittee unanimously agreed that there is no current justification for the appointment of a task group to investigate the writing of specifications for sucker rods which do not meet the current [Spec.] 11B specifications. This Subcommittee encourages all potential manufacturers to continue to develop new products. This Subcommittee has concurred that sucker rods can be welded in a manner that meets the current [Spec.] 11B specifications. This Subcommittee believes that Consolidated Metal's sucker rods do not meet 11B specifica-

tions because of tensile strength characteristics.

At this point API and Consolidated began their long and heated dispute over whether Spec. 11B did or did not "cover" Consolidated's three-piece threaded design and whether the user subcommittee made any determination on the matter. API contends that the user subcommittee's interest in tensile strength in part reflects a concern with the strength of the threaded joint between the shaft and heads in Consolidated's design, a concern Spanhel also held. In any event, API contends, Spanhel understood the user subcommittee's ruling, reasonably, as either rejecting or tabling Consolidated's application for product approval. Accordingly, API contends, Spanhel's own judgment in the matter was confirmed and he justifiably refused to grant Consolidated's application for the monogram.

Consolidated, on the other hand, contends that Spec. 11B "covered" its design because it did not specifically exclude threaded-on coupler heads. Consolidated also insists that the user subcommittee's concern with tensile strength could be addressed merely by changing the type of steel in the rod and had nothing to do with the threaded joints. Spanhel, Consolidated contends, should have known this and could not reasonably have understood the user committee's statements as accepting any delay in API approval of Consolidated's rod.

On several occasions during the three months after the June 1981 standards meeting, Consolidated and API discussed the possible approval of Consolidated's rods. Consolidated continued to press for approval, insisting that Spec. 11B "did not exclude" its design, and Spanhel, for API, continued to insist upon more time to study the performance of the three-piece thread-

1. The API production department is headed by a general committee that oversees standardization committees charged with formulating standards on categories of equipment. The sucker rod standardization committee was composed of manufacturer and user subcommittees. Although these committees participate in the development and revision of API specifications, the final authority for the administration of

API's product approval program is vested in the director of the production department who, for this matter, had delegated his authority to Spanhel.

2. At the time Consolidated and the other innovators applied for the API monogram, Spec. 11B had not been changed substantially since 1927.

ed rod. In September 1981, after Consolidated threatened to sue, API set up a standards subcommittee to consider revising Spec. 11B to incorporate the three-piece threaded design. The discussions between Consolidated continued unchanged in both acrimony and substance. API completed and approved specifications for three-piece threaded rods on January 14, 1983 and formally licensed use of its monogram on Consolidated's rod on April 15, 1983.

Seven days later, on April 22, 1983, Consolidated filed the complaint in this case, alleging a conspiracy between Continental Emsco, Inc., Dover Corporation (both established manufacturers of conventional sucker rods), API, and several unnamed co-conspirators. All were listed as defendants. Consolidated's complaint, the defendants' responses, and two years of discovery have focussed on whether it was "reasonable" for API to delay Consolidated a monogram license from June 1981 to April 1983. The district court granted summary judgment in favor of all the defendants. Consolidated appeals only the judgment for API.

## II.

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law". Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.

Only disputes over material facts, facts that might affect the outcome of the lawsuit under the governing substantive law, will preclude summary judgment.[3]

It is true that summary judgment is less common in antitrust cases than in other cases, but this is not because different rules apply to those cases.[4] Rather, it is because the relevant factual disputes in antitrust cases are typically more complicated that those in other cases.[5] Accordingly, it is typically more difficult for the trial court to resolve all doubt about the merits of an antitrust claim on the basis of the written, pre-trial record alone.[6] But this is certainly not always so.

In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, the Supreme Court upheld a summary judgment against the

3. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). *See also Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987), and the cases cited there.

4. *See, e.g., Walker v. U–Haul Co. of Mississippi*, 734 F.2d 1068, 1070–71 (5th Cir.1984); *Bayou Bottling, Inc. v. Dr. Pepper Co.*, 725 F.2d 300, 303 (5th Cir.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984); *Parsons v. Ford Motor Co.*, 669 F.2d 308, 313 (5th Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982); *General Chemicals v. Exxon Chemical Co., USA*, 625 F.2d 1231, 1233 (5th Cir.1980). *See also Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1110 (5th Cir.1979).

5. In *Poller v. Columbia Broadcasting System, Inc.*, the Supreme Court stated:

> [S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury ... .

368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). *See also Industrial Investment Development Corp. v. Mitsui & Co.*, 671 F.2d 876, 884 (5th Cir.1982), *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), concluding that summary judgment is inappropriate against antitrust plaintiffs "where there is ample evidence of a conspiracy" and when "plaintiffs have not had an opportunity to depose one of the conspirators on the effect and intent of their efforts". *Cf. Croley v. Matson Navigation Co.*, 434 F.2d 73, 77 (5th Cir.1970), stating that summary judgment should be used cautiously "when resolution of the dispositive issue requires a determination of state of mind".

6. *See* 10A C.A. Wright, A. Miller, and M. Kane, Federal Practice and Procedure § 2732.1 at 319 (2d ed. 1983).

plaintiffs on their claim under section 1 of the Sherman Act, stating:

> To survive [the defendants'] motion for summary judgment, [the plaintiffs] must establish that there is a genuine issue of material fact as to whether [the defendants] entered into an illegal conspiracy that caused [the plaintiffs] to suffer a cognizable injury.... This showing has two components. First, [the plaintiffs] must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from illegal conduct.
>
> . . . . .
>
> Second, the issue of fact must be "genuine." Fed.R.Civ.Pro. 56(c), (e).... When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.[7]

Thus, when defending its antitrust claim against summary judgment, Consolidated faces the same hurdle as the plaintiff in any other cause of action: it "must come forward with 'specific facts showing that there is a *genuine issue for trial*' ".[8]

As required when reviewing a grant of summary judgment, we view the written record in the light most favorable to Consolidated, the party opposing the motion, when deciding if a genuine issue of material fact exists.[9] We conclude that, viewed

in any light, the record in this antitrust case presents no basis for a trial.

### III.

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal". But as the Supreme Court observed in *Northwest Wholesale Stationers, Inc. v. Pacific Stationary and Printing Co.*,

> [E]very commercial agreement restrains trade. Whether this action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint.[10]

To prove an "unreasonable" restraint, Consolidated may proceed along two avenues of proof. "The rule of reason" requires Consolidated to show that API's product approval program is a conspiracy to produce an anticompetitive effect on the relevant market. "The *per se* rule" requires Consolidated to show that API's product approval program is conduct presumed to have such an anticompetitive effect.

### A.

We address first the *per se* rule and its scope. In *Northwest Wholesale Stationers*, the Supreme Court stated that section

---

**7.** 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (footnotes and citations omitted). In this passage, the Court cites a passage in *First National Bank of Arizona v. Cities Service Co.*, which states:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring everyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed. 2d 569 (1968), *cited in Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56, 106 S.Ct. at 2509–10.

**8.** *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (original emphasis), quoting Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265

(1986); *Liberty Lobby*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10. *See also Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 137–38 (5th Cir.1987), applying *Celotex* and upholding summary judgment against antitrust plaintiff. *See generally* Comment, Summary Judgment: The Majority View Undergoes a Complete Reversal in the 1986 Supreme Court, 37 Emory L.J. 171, 191–215 (1988), and Turner, The Durability, Relevance, and Future of American Antitrust Policy, 75 Calif.L.Rev. 797, 814–15 (1987), both concluding that *Matsushita, Liberty Lobby*, and *Celotex* signal a retreat from *Poller*.

**9.** *See, e.g., Phillips Oil Co. v. OKC Corp.*, 812 F.2d at 272, and the cases cited there.

**10.** 472 U.S. 284, 289, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985) (original emphasis; citation to *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918), omitted).

claims should be subject to rule of reason analysis

unless the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

... The decision to apply the *per se* rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output ... or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979).[11]

The Court termed this, mildly, "an area of antitrust law that has not been free of confusion".[12]

**11.** *Id.* 472 U.S. at 289–90, 105 S.Ct. at 2617.

**12.** *Id.* at 289 & n. 3, 105 S.Ct. at 2616 n. 3. *See* 7 P. Areeda, Antitrust Law ¶¶ 1508–1511 (1986 & Supp. 1987); L. Sullivan, Law of Antitrust 229–30 (1977). *See also* Turner, 75 Calif.L.Rev. at 799–800; Bauer, Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination, 79 Colum.L.Rev. 685, 692–94 (1979).

**13.** *Northwest Wholesale Stationers*, 472 U.S. at 289, 105 S.Ct. at 2616–17.

**14.** *See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.* ["*BMI*"], 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979), stating that *per se* treatment is justified only where the purpose and effect of the challenged practice "are to threaten the proper operation of our predominantly free market economy", or where the "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output"; *Continental T.V., Inc. v. GTE Sylvania, Inc.* ["*GTE Sylvania*"], 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), stating that "*per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive"; *United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), stating that "[i]t is

There must be principled limits on the *per se* rule. The Supreme Court has long recognized that "concerted refusals to deal or group boycotts" should be condemned as *per se* violations.[13] Nonetheless, because a *per se* ruling declares illegal an entire class of business practices on the basis of only attenuated inquiry into the economic consequences, the Court has also long cautioned against its overzealous use.[14] As the Eighth Circuit observed,

The term "group boycott" ... is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "*per se*" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.[15]

Recently, in *FTC v. Indiana Federation of Dentists*, the Court again cautioned against resolving section 1 cases "by forcing the [defendant's] policy into the 'boycott' pigeonhole", especially when it would "extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact ... is not immediately obvious".[16]

only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act.".

**15.** *Mackey v. National Football League*, 543 F.2d 606, 619 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), quoting *Worthen Bank & Trust Co. v. National Bank-Americard, Inc.*, 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). *Accord United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1365–69 (5th Cir.1980); *E.A. McQuade Tours, Inc. v. Consolidated Air Manual Committee*, 467 F.2d 178, 186–87 (5th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). *See also Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Ass'n*, 672 F.2d 1280, 1284–85 (7th Cir.1982); *United States Trotting Ass'n, Inc. v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir.1981) (en banc).

**16.** 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986). Moreover, in the course of deciding whether a business practice challenged under Section 1 fits within the "boycott pigeonhole", many courts find themselves in a detailed inquiry into the economic effects of the practice—precisely the sort of "rule of reason" analysis the *per se* approach is supposed

As *Northwest Wholesale Stationers* explained, to state a *per se* violation, "[t]he mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive".[17] The Court emphasized that the denial of necessary business relations is crucial to *per se* illegality:

> Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." Sullivan, [Law of Antitrust] at 261–62. *See, e.g. Silver* [*v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)] (denial of necessary access to exchange members); *Radiant Burners Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 [81 S.Ct. 365, 5 L.Ed.2d 358] (1961) (denial of necessary certification of product); *Associated Press v. United States*, 326 U.S. 1 [65 S.Ct. 1416, 89 L.Ed. 2013] (1945) (denial of important sources of news); *Klor's Inc.* [*v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)] (denial of wholesale supplies). In these cases, the boycott often cut off access to a supply, facility, or market

necessary to enable the boycotted firm to compete, *Silver, supra; Radiant Burners, Inc., supra,* and frequently the boycotting firms possessed a dominant position in the relevant market. *E.g., Silver, supra; Associated Press, supra; Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457 [61 S.Ct. 703, 85 L.Ed. 949] (1941). *See generally* Brodley, Joint Ventures and Antitrust Policy, 95 Harv.L.Rev. 1523, 1533, 1563–65 (1977).[18]

Similarly, in *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, this court engaged in a lengthy analysis of the same cases and concluded that the *per se* rule applied only "[w]here exclusionary or coercive conduct has been present." [19]

Consolidated offers no evidence, when viewed in the light of these cases, that merits treating API's product approval program as a "group boycott", *per se* illegal under section 1.[20] In the various cases discussed in *Northwest Wholesale Stationers* and *E.A. McQuade Tours*, the touchstone of *per se* illegality is that the customers or suppliers of the plaintiff had, as a group, agreed or been forced to cease doing business with the plaintiff.[21] In this

---

to eliminate for "obviously" anticompetitive practices. *See* Sullivan, Antitrust Law at 239, 241–45; Bauer, 79 Colum.L.Rev. at 694–95, 703–04 & n. 82.

**17.** 472 U.S. at 298, 105 S.Ct. at 2017–18. As one commentator notes, however, it is often difficult to determine what *will* suffice:

> [W]hile the per se illegality rule seems appropriate for naked horizontal boycotts such as those involved in *Klor's, Inc. v. Broadway-Hale Stores,* [359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959),] there are often problems in determining whether a collective refusal to deal is "naked." The status of refusals to deal associated with lawful joint ventures or similar cooperative enterprises will also need further clarification.

Turner, 75 Calif.L.Rev. at 802.

**18.** *Northwest Wholesale Stationers,* 472 U.S. at 294, 105 S.Ct. at 2619.

**19.** 467 F.2d at 187. *See also Realty Multi-List,* 629 F.2d at 1366–67.

**20.** We note that *Northwest Wholesale Stationers* specifically forecloses the use Consolidated

wishes to make of *Silver,* 373 U.S. 341, 83 S.Ct. 1246. Unlike the New York Stock Exchange, API is not a self-regulating monopoly sanctioned by Congress. Thus, Consolidated's litany of alleged deficiencies in API's monogram licensing process—including, for example, the lack of any avenue of appeal from the decisions of API's Standards Committee and API's monogram licensing staff—is irrelevant. "The absence of procedural safeguards can in no sense determine the antitrust analysis. ... [T]he antitrust laws do no themselves impose on joint ventures a requirement of due process." *Northwest Wholesale Stationers,* 472 U.S. at 293, 105 S.Ct. at 2619. *Cf. Realty Multi-List, Inc.,* 629 F.2d at 1367 n. 30, and *Hatley v. American Quarter Horse Ass'n,* 552 F.2d 646, 652 (5th Cir.1977), both construing *Silver* as outside the *per se* principle.

**21.** In *Fashion Originators' Guild,* 312 U.S. at 461, 61 S.Ct. at 705, the defendants "admit that to destroy ... competition [by other manufacturers] ... they have in combination purposely boycotted and declined to sell their products to retailers". In *Eastern States Retail Lumber*

case, Consolidated complains of lost sales but fails to allege that sucker rod users are in some way constrained from buying its products. Indeed, Consolidated admits that, before the demand for domestically-produced oil fell, it was able to sell a substantial amount of its rods.

■ We hold that a trade association that evaluates products and issues opinions, without constraining others to follow its recommendations, does not *per se* violate section 1 when, for whatever reason, it fails to evaluate a product favorably to the manufacturer.[22] Here, denial of API certification in no real sense "excludes" Consolidated from the market: without certification, Consolidated admits that it is still free to sell its products and consumers are free

to buy them.[23] In no real sense is the monogram "necessary" to the sale of sucker rods: Consolidated does not allege that consumers are somehow unable to use its rods as they would API-monogrammed rods.[24] Thus, Consolidated offers no evidence of a *per se* violation of section 1.

## B.

■ Neither does Consolidated present a factual dispute material to proving a section 1 violation under the rule of reason. As this court said in *Northwest Power Products v. Omark Industries,* "[t]o prove an antitrust violation under the rule of reason ... [a plaintiff] must show the defendant's conduct adversely affected competition".[25] That is, the rule of reason

*Dealers Assoc. v. United States,* 234 U.S. 600, 608–09, 612, 34 S.Ct. 951, 952–53, 954, 58 L.Ed. 1490 (1914), the evidence suggested that a combination of retail lumber dealers had agreed not to do business with wholesalers who sold directly to the retailers' customers. In *Klor's,* 359 U.S. at 213, 79 S.Ct. at 710, the plaintiff was an appliance retailer whose principal competitor had secured the agreement of the plaintiff's suppliers not to sell appliances to the plaintiff (or to charge exhorbitant prices). The plaintiff, without alternative sources of supply, was forced from the business. In *Radiant Burners,* 364 U.S. at 658, 81 S.Ct. at 366–67, the only supplier of natural gas in Chicago agreed with an association of gas appliance manufacturers to supply gas only to homes using appliances approved by the association. The effect was that consumers could not use products unless approved by the association: there could be no demand for a competing manufacturer's gas appliances unless the association approved.

In *Associated Press,* 362 U.S. at 4, 65 S.Ct. at 1417, AP's bylaws forbade member news associations from doing business with non-members: an explicit boycott. Also, the *per se* holding in *Associated Press* may be based more on the territorial division imposed by AP than by any boycott. *Id.* at 24–25, 65 S.Ct. at 1426–27 (Douglas, J., concurring). *See also Realty Multi-List,* 629 F.2d at 1366–67 n. 30, arguing that *Associated Press* is not a "boycott" case.

In *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.* ["*ASME*"], 456 U.S. 556, 570–71, 102 S.Ct. 1935, 1944–45, 72 L.Ed.2d 330 (1982), a case Consolidated contends is dispositive of this one, the Court discusses discriminatory application of trade standards in conjunction with cases of *per se* violations. Although this suggests that the challenged practice in *ASME* could have been *per se* illegal, we note that the later case of *Northwest Wholesale Stationers* does not include *ASME* in its extensive

discussion of cases of *per se* violations. *See* 472 U.S. at 293–94, 105 S.Ct. at 2619. In any event, *ASME* involved both regulations that have the force of law and a direct conspiracy between the *ASME* staff and the plaintiff's competitors. 456 U.S. at 559, 561–62, 102 S.Ct. at 1939–41. These factors are absent here.

**22.** *See Eliason Corp. v. National Sanitation Foundation,* 614 F.2d 126, 129 (6th Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 89, 66 L.Ed.2d 29 (1980). *But see* Sullivan, Antitrust Law at 249, arguing that it follows from *Radiant Burners* that purely advisory trade standards are a *per se* violation of Section 1 if shown to be "unreasonable": "any other course would create too great a risk of competitive injury". As we discuss below, although purely advisory trade standards may violate Section 1 under the "rule of reason", the antitrust laws do not give every producer denied certification a right to review in the federal courts.

**23.** Unlike the defendants in *Fashion Originators' Guild, Eastern States, Associated Press,* and *Klor's,* API has secured no agreement by suppliers or customers not to deal with Consolidated. *See* note 21.

**24.** Unlike the trade standards challenged in *ASME,* API specifications do not have the force of law and, unlike the defendants in *Radiant Burners,* API does not deny buyers of uncertified rods access to other goods necessary to use them. *See* note 21.

**25.** 576 F.2d 83, 90 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). *See also North Mississippi Communications, Inc. v. Jones,* 792 F.2d 1330, 1334 (5th Cir.1986); *Industrial Investment Development Corp.,* 671 F.2d at 889–90 n. 16; *Associated Ra-*

requires plaintiffs to show that the defendants' actions amounted to a conspiracy against the market—a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare.[26] Under the rule of reason, the antitrust laws protect competition, not particular competitors.[27] In addition, the absence of procedural safeguards in the process of making business decisions "can in no sense determine the antitrust analysis".[28]

Accordingly, a showing that the defendants harmed the plaintiffs is not enough to prove a violation of section 1 under the rule of reason. It is a natural part of a competitive market that products, firms, and—sometimes—entire sectors of the economy fail. A plaintiff does not have a claim under the rule of reason simply because others refuse to promote, approve, or buy its products.

The plaintiff's contentions in this case, however, amount to little more than this. It is undisputed that API approval has commercial value and that API took two years to approve Consolidated's product. What is more important in this case is what Consolidated fails to assert. It does not allege that API somehow coerces users to buy only monogrammed rods, it provides little concrete information about "the suck-

er rod market", and it no longer contends that there was an anticompetitive conspiracy between its competitors and API. Consolidated asserts only that because API is a trade association, it is a "walking conspiracy" and then contends, at bottom, that because the monogram has great value, Consolidated is entitled to a trial on the question whether API was justified in taking two years to approve its product.

■ We disagree. Under the rule of reason, the plaintiff must establish two elements basic to an anticompetitive conspiracy: (1) that the defendant engaged in some form of joint action and (2) that this joint action amounted to an unreasonable restraint of trade.[29] Although Consolidated may be able to show that the delay in API approval of its product was unjustified, this does not, by itself, present a genuine dispute over either of these elements necessary to its section 1 claim.

■ 1. *Proof of a conspiracy.* Consolidated offers no evidence tending to show a conspiracy. API, the sole defendant on appeal, concedes that it is a trade association and is the only domestic standard-setting body for oil well equipment. A trade association by its nature involves collective action by competitors. Nonetheless, a trade association is not by its nature a

*dio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342, 1350–51 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1980); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 296 (5th Cir.1981).

**26.** *National Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Oklahoma [*"NCAA"*],* 468 U.S. 85, 99–100, 104 S.Ct. 2948, 2959–60, 82 L.Ed.2d 70 (1984); *BMI,* 441 U.S. at 19–20; *United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978). *See* Sullivan, The Viability of the Current Law on Horizontal Restraints, 75 Calif.L.Rev. 835, 840–51 (1987), arguing that antitrust injury includes more than just the deadweight loss from reduced output and increased price. *See also* Kaplow, The Accuracy of Traditional Market Power Analysis and a Direct Adjustment Alternative, 95 Harv.L.Rev. 1817 (1982), discussing the broader social costs of market power; Lande, Wealth Transfers as the Original and Primary Concern of Antitrust: The Efficiency Interpretation Challenged, 34 Hastings L.J. 67 (1982), discussing distributive concerns and antitrust law.

**27.** *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977); *Brown Shoe Co. v. United States,* 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed.2d 510 (1962). *See also Costello Publishing Co. v. Rotelle,* 670 F.2d 1035, 1042 n. 7 (D.C.Cir. 1981); *Travelers Ins. Co. v. Blue Cross of Western Pennsylvania,* 481 F.2d 80, 84 (3d Cir.), *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); Breyer, Antitrust, Deregulation, and the Newly-Liberated Marketplace, 75 Calif.L. Rev. 1005, 1018 (1987).

**28.** *Northwest Wholesale Stationers,* 472 U.S. at 293, 105 S.Ct. at 2619.

**29.** *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479, 1485 (D.C.Cir.1984). There are other elements to a section 1 claim, such as damages, but we need not address them here. *See generally Park v. El Paso Bd. of Realtors,* 764 F.2d 1053, 1059 (5th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986); *Solomon v. Houston Corrugated Box Co., Inc.,* 526 F.2d 389, 395–96 (5th Cir.1976).

"walking conspiracy", its every denial of some benefit amounting to an unreasonable restraint of trade.[30] In particular, it has long been recognized that the establishment and monitoring of trade standards is a legitimate and beneficial function of trade associations.[31]

To survive summary judgment on the issue of conspiracy, the plaintiff must present evidence that tends to exclude both the possibility of conduct consistent with permissible competition and the possibility that the alleged conspirators acted independently.[32] API's delay in licensing its monogram to Consolidated, even if hindsight shows it to be unjustified, is not enough in itself to fall within the forbidden category. It is axiomatic that trade standards must exclude some things as substandard[33] and it is unsurprising that standard-setting bodies sometimes err. A single such error does not amount to a conspiracy.

Consolidated offers no evidence that API's product approval program is merely a ploy to obscure a conspiracy against competing producers. On its face, Spec. 11B is, in the language of *Radiant Burners,* both "reasonable" and "objective".[34] It contains requirements for the strength and durability of the steel used and requirements for standard dimensions and threads on the coupler heads. These requirements reflect a sensible concern for the users of the equipment. Further, Spec. 11B explains these requirements with diagrams and engineering specifications that are neither vague, judgmental, nor imprecise. In short, nothing about Spec. 11B suggests that it is a sham.

 2. *Unlawful purpose as proof of unreasonable restraint.* Even if Consolidated could show a conspiracy, it fails to offer any evidence of an unreasonable restraint of trade. Under section 1, an unreasonable restraint of trade "may be established by proof of *either* an unlawful purpose or an anticompetitive effect".[35]

Other than the possible lack of justification for the delay, Consolidated offers scant evidence suggesting an unlawful purpose behind API actions. The evidence suggests that in processing Consolidated's application for the monogram, API followed its normal procedure for analysis of a new product. Although the user subcommittee's initial verdict on Consolidated's application does not make clear how the three-piece threaded rod could be made to comply with API standards, it did not foreclose the possibility.[36] There are no indica-

---

**30.** *See Maple Flooring Manufacturers Ass'n v. United States,* 268 U.S. 563, 582–87, 45 S.Ct. 578, 584–86, 69 L.Ed. 1093 (1925). The mere exchange of information, or even consciously parallel action, is insufficient to establish a conspiracy under section 1. *Id.* at 583–85, 45 S.Ct. at 585–86; *Park,* 764 F.2d at 1060; *Kreuzer,* 735 F.2d at 1187. Moreover, the mere showing of relationships between alleged conspirators is insufficient to imply a conspiracy; section 1 requires an actual agreement, explicit or implicit. *Kreuzer,* 735 F.2d at 1488. Although the agreement need not be proved directly, the plaintiff must show that there was a single plan, the essential nature and general scope of which was known to those responsible for its implementation. *H & B Equipment Co., Inc. v. International Harvester Co.,* 577 F.2d 239, 245 (5th Cir.1978).

**31.** *Maple Flooring,* 268 U.S. at 586–87, 45 S.Ct. at 592–93.

**32.** *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1357.

**33.** *Structural Laminates, Inc. v. Douglas Fir Plywood Ass'n,* 261 F.Supp. 154, 159 (D.Ore.1966), aff'd 399 F.2d 155 (9th Cir.1968), *cert. denied,* 393 U.S. 1024, 89 S.Ct. 636, 21 L.Ed.2d 569 (1969). *See also Eliason Corp.,* 614 F.2d at 129–30; *Hatley,* 552 F.2d at 652–53; *Roofire Alarm Co. v. Royal Indemnity Co.,* 202 F.Supp. 166, 169 (E.D.Tenn.1962), *aff'd,* 313 F.2d 635 (6th Cir.), *cert. denied,* 373 U.S. 949, 83 S.Ct. 1678, 10 L.Ed.2d 704 (1963). Moreover, a conspiracy cannot be inferred from a *single* instance of denied certification. *H & B Equipment,* 577 F.2d at 245.

**34.** 364 U.S. at 658, 81 S.Ct. at 366–67. *See generally* Sullivan, Law of Antitrust at 248–49, discussing "sham" standards programs.

**35.** *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 243, 100 S.Ct. 502, 509–10, 62 L.Ed.2d 441 (1980) (original emphasis).

**36.** The record suggests that the user subcommittee neither approved nor disapproved Consolidated's sucker rod design. The minutes of the subcommittee meeting simply state a concern about the tensile strength characteristics of the rod Consolidated presented for approval and indicate that the subcommittee put on hold the broader matter of the three-piece threaded design. The depositions of the subcommittee

tions that approval was delayed in bad faith.[37] Indeed, that API certified the three-piece welded rod design at the same time it passed over Consolidated's three-piece threaded design suggests the absence of any desire to suppress innovative products.

Moreover, API's user committee, which found that Consolidated's rod design did not meet Spec. 11B, is composed not of Consolidated's competitors but of *buyers* of sucker rods—businesses who could have no motive for driving Consolidated from the market.[38] Although it is at least conceivable that the API staff in charge of licensing the monogram might have been influ-

enced by competing manufacturers to drive Consolidated from the market,[39] Consolidated presents no evidence suggesting this possibility. The evidence in the written record suggests nothing more than a technical debate among engineers.[40]

■ 3. *Anticompetitive effect as proof of unreasonable restraint.* Neither does Consolidated offer evidence that could show that API's actions had an anticompetitive effect. There is no dispute that the API monogram is very important to buyer acceptance of sucker rods.[41] But this alone is not enough to prove that denial of API certification amounts to a restraint of trade barred by section 1.[42]

members manifest uncertainty about what course the users thought best to take: some seem concerned about the new design's durability, others, not; none recall any consensus on the matter.

**37.** After the user subcommittee decision, Spanhel, the API official in charge of processing monogram licenses, denied Consolidated's application. We see no merit in Consolidated's argument that Spanhel misconstrued the user subcommittee's decision. The user subcommittee's concerns and indecision about Consolidated's product certainly did *not* constitute a recommendation that Consolidated be granted the API monogram immediately.

**38.** *See Moore v. Boating Industry Ass'n,* 819 F.2d 693, 703 (7th Cir.1986), *cert. denied,* — U.S. ——, 108 S.Ct. 160, 98 L.Ed.2d 115 (1987). *See also Matsushita,* 475 U.S. at 593–94, 106 S.Ct. at 1359–60, and *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 762–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984), both concluding that courts should not permit factfinders to infer implausible conspiracies.

**39.** In *ASME,* for example, direct collusion between trade association staff and the plaintiff's competitors led to the association's denial of product certification. 456 U.S. at 561–63, 102 S.Ct. at 1939–41.

**40.** It is significant that API did ultimately revise Spec. 11B to incorporate the three-piece threaded design and certified Consolidated's rod. API's decision to establish a subcommittee to study the three-piece, threaded design was consistent with earlier concerns about how the design performed in the field. Consolidated's contention that this process was excessively slow is unsupported by any evidence of how expeditiously API usually acts on such applications. Nor does Consolidated show clandestine meetings, bribes, or other evidence that the user

subcommittee or Spanhel were unduly influenced by Consolidated's competitors.

**41.** Consolidated's original complaint alleges that:
[b]ecause of widespread acceptance of and reliance on the API standards as a measure of quality and fitness for use, certification by the API through the licensing of its monogram is essential for manufacturers of sucker rods and related equipment to compete effectively in the marketplace.
In its response, API denies this "to the extent that during the 1980–82 ... shortage of production equipment including sucker rods, due to the explosive growth in domestic petroleum exploration, ... plaintiff and other producers ... sold large quantities of rods which did not bear the API monogram".

**42.** Whatever API's admission, reproduced in note 41, is taken to mean, Consolidated must present more concrete information on "the sucker rod market" to show the market effects of API's product approval program required by the rule of reason. *See Monsanto,* 465 U.S. at 762, 104 S.Ct. at 1470; *GTE Sylvania,* 433 U.S. at 51, 97 S.Ct. at 2558; *Northwest Power Products,* 576 F.2d at 90–91. Neither party offers this court much useful information about "the sucker rod market". For example, we do not know how many of the rods are sold each year, how many of these bear the API monogram, whether there are substitutes for sucker rods, or how concentrated the market is on the supply or demand side. *See generally* Landes and Posner, Market Power in Antitrust Cases, 94 Harv.L. Rev. 937 (1981), discussing considerations relevant to market power. *See also* Stigler, A Theory of Oligopoly, 72 J. Pol. Econ. 44 (1964), *reprinted in* Stigler, The Organization of Industry 39 (1968), discussing market factors necessary to successful anticompetitive collusion. *But see* Rowe, Market as Mirage, 75 Calif.L.Rev. 991 (1987), discussing the subjectivity inherent in determining the relevant market.

As we have said, Consolidated offers no evidence that its customers were coerced by API or otherwise constrained to buy only monogrammed products.[43] Absent evidence of coercion, there is no reason to assume that buyers do not rely voluntarily on the API monogram. Product information is crucial to a competitive market.[44] Consumers seek it out, for example, by reading *Consumer Reports*, or relying upon the Good Housekeeping and Underwriters Laboratories seals of approval. This information saves buyers the trouble of investigating products themselves and the risk of trying untested products. API product approval may be important to user acceptance of new sucker rods just as a favorable review in *Consumer Reports* magazine, the "Good Housekeeping Seal of Approval", and the seal of the Underwriters Laboratories are important to buyer acceptance of new consumer goods.[45] Even if user reliance gives API significant influence over the market, that influence may enhance, not reduce, competition and consumer welfare.[46]

Although there is some danger that API could use its influence to reduce competition, this danger is small so long as users rely voluntarily upon the API monogram.[47] If users choose freely to rely on API approval, API has influence principally because it has done a good job evaluating products. If API fails to evaluate products accurately, consumers free to sample non-monogrammed goods will gradually discover the monogram's diminished usefulness and cease relying upon it. Thus, the greatest threat to competition is in the short run, before a significant number of buyers shop around. Even this threat is mitigated to the extent that producers of unmonogrammed equipment have alternative means of reassuring consumers of the quality of their products. They may, for example, offer warranties, commission product tests by someone other than API, provide free (or low-cost) samples of their product, and advertise.[48]

Here, however, Consolidated had no trouble gaining acceptance of its product even in the short run; it was able to sell substantial amounts of its rods as soon as

---

**43.** We note again that in this respect, this case differs significantly from *ASME,* where the Court found that

[ASME's] codes, while only advisory, have a powerful influence: federal regulations have incorporated many of them by reference, as have the laws of most States, the ordinances of major cities, and the laws of all the Provinces of Canada. ... Obviously, if a manufacturer's product cannot satisfy the applicable AMSE code, it is at a great disadvantage in the marketplace.

456 U.S. at 559, 102 S.Ct. at 1938–39. Similarly, the violation in *Silver,* 373 U.S. 341, 83 S.Ct. 1246, was based upon the power granted by law to the New York Stock Exchange to act as a gatekeeper for the financial markets. *See Northwest Wholesale Stationers,* 472 U.S. at 293, 105 S.Ct. at 2619. Here, API's codes have no such legal force.

**44.** *See* Stigler, The Economics of Information, 69 J. Pol. Econ. 213 (1961); Akerlof, The Market for "Lemons": Quality Uncertainty and the Market Mechanism, 84 Q.J.Econ. 488 (1970).

**45.** *See* Barzel, Measurement Cost and the Organization of Markets, 25 J.L. & Econ. 27, 27 (1982).

**46.** Because product information reduces uncertainty, it both increases consumer demand for the product and encourages producers to im-

prove their products. *See id.* at 29–31, explaining how competition can force sellers to provide accurate quality information to consumers. These are benefits that the antitrust laws should not discourage. *See Eliason,* 614 F.2d at 129–30; *Hatley,* 552 F.2d at 653–54; *Structural Laminates,* 261 F.Supp. at 159; *Roofire Alarm,* 202 F.Supp. at 169. *Cf. BMI,* 441 U.S. at 18–23, 99 S.Ct. at 1561–64, and *NCAA,* 468 U.S. at 103, 104 S.Ct. at 2961, both discussing "output enhancement" as an indicator of the usefulness of a challenged practice.

**47.** Economists also acknowledge that the problem is different when quality standards have the force of law. *See, e.g.,* Leland, Quacks, Lemons, and Licensing: A Theory of Minimum Quality Standards, 87 J. Pol. Econ. 1328 (1979), arguing that if minimum quality standards can be enforced effectively, they will be too high if set by the industry itself.

**48.** *See* Akerlof, 84 Q.J.Econ. at 499–500, discussing various means of assuring consumers of product quality; Barzel, 25 J.L. & Econ. at 32–42, doing the same. *See also* Grossman, The Informational Role of Warranties and Private Disclosure about Product Quality, 24 J.L. & Econ. 461 (1981), arguing that consumer expectations force makers of new products to provide reliable information about product quality.

production began. Consolidated's problem is better characterized as difficulty retaining its business when overall demand for rods slackened. We do not know if Consolidated lost a greater proportion of its sales during the decline of domestic oil production than other sucker rod producers. But even if it did, absent evidence of anticompetitive animus or buyer coercion by API, there is no reason to believe that it was due to anything other than customer dissatisfaction.[49]

### C.

In sum, it is not enough to meet the plaintiff's burden under the rule of reason that the plaintiff was harmed because the defendant refused without justification to promote, approve, or buy the plaintiff's product. Neither anticompetitive animus nor the other elements of a section 1 claim can be inferred solely from the incorrectness of a single business decision by a standard-setting trade association. The "reasonableness" of a restraint is judged by its general effect on the market, not by the circumstances of a particular application. An individual business decision that is negligent or based on insufficient facts or illogical conclusions is not a sound basis for antitrust liability.[50]

Were this not so, the federal courts would become boards of automatic review for trade association standards committees, product testing services, and countless other business transactions. Not only would this tax the abilities of the federal courts, but fear of treble damages and judicial second-guessing would discourage the establishment of useful industry standards.[51] Under such a regime, the antitrust laws would stifle, not protect, the competitive market.

### IV.

Because Consolidated presents no genuine dispute of facts material to its section 1 claim under either the rule of reason or the *per se* rule, the judgment of the district court is AFFIRMED.

---

**49.** We note that the closing sentences of Consolidated's own statement of the facts on appeal state:

> During the two year period that Consolidated waited to obtain a monogram from API, the oil boom collapsed and the market for sucker rods dried up. *Unable to sell even monogrammed sucker rods,* Consolidated went into receivership.

Appellant's Brief at 12 (emphasis added). This plainly suggests that the lack of the API monogram was far from the principal source of Consolidated's business problems.

**50.** *See United States Gypsum,* 438 U.S. at 441–42, 98 S.Ct. at 2875–76. *See also* 2 P. Areeda & D. Turner, Antitrust Law 29 (1978); R. Bork, The Antitrust Paradox 78 (1978).

**51.** *See Indian Head, Inc. v. Allied Tube & Conduit Corp.,* 817 F.2d 938, 946–47 (2d Cir.), *cert. granted,* —— U.S. ——, 108 S.Ct. 65, 98 L.Ed.2d 29 (1987).